# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-329V**

| | |
|---|---|
| J.A.,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Master Horner<br><br>**Filed: April 23, 2026**<br>**Refiled as Redacted: November 16, 2026** |

*Edward Kraus, Kraus Law Group, LLC, Chicago, IL, for petitioner.*
*Lauren Kells, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING ON ENTITLEMENT[1]

On March 24, 2020, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that he developed multiple sclerosis, which was caused-in-fact or significantly aggravated by the Menactra meningococcal vaccine petitioner received on January 11, 2018.[3] (ECF No. 1.) For the reasons set forth below, I conclude that petitioner is entitled to an award of compensation.

[1] When this decision was originally filed the undersigned advised his intent to post it on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), petitioner filed a timely motion to redact, requesting that his name be redacted to initials, which was granted. This decision is being reissued with petitioner's name reduced to initials in both the case caption and footnote 3. Except for those changes and this footnote, no other substantive changes have been made. This decision will be posted on the court's website with no further opportunity to move for redaction.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

[3] When the petition was initially filed, petitioner was a minor child. (ECF No. 1.) Accordingly, Andrea Anderson, petitioner's parent, filed the petition on behalf of petitioner. (*Id.*) On September 30, 2024, Andrea Anderson moved to amend the case caption to reflect J.A. as the sole petitioner given that he had reached the age of majority. (ECF No. 58.) Petitioner's motion was granted, and the case caption was subsequently updated. (ECF No. 59.)

## I. Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a causal link between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005).

A petitioner may also allege that a vaccine caused a "significant aggravation" of a pre-existing condition. The Vaccine Act defines a significant aggravation as any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health. § 300aa-33(4). Where a petitioner in an off-Table case is seeking to prove that a vaccination aggravated a pre-existing injury, petitioners must also address three *additional* factors beyond the three-part *Althen* test. *See Loving v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 135, 144 (2009) (combining the first three *Whitecotton* factors for claims regarding aggravation of a Table injury with the three *Althen* factors for off-Table injury claims to create a six-part test for off-Table aggravation claims); *see also W.C. v. Sec'y*

*of Health & Human Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (applying the six-part *Loving* test). The additional *Loving* factors require petitioners to demonstrate aggravation by showing: (1) the vaccinee's condition prior to the administration of the vaccine, (2) the vaccinee's current condition, and (3) that the vaccinee's current condition constitutes a "significant aggravation" of the condition prior to the vaccination. *W.C.*, 704 F.3d at 1357.

Vaccine Program petitioners must establish their claim by a "preponderance of the evidence." § 300aa-13(a). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence." *Moberly*, 592 F.3d at 1322 n.2. Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination. *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record. Vaccine Rule 3(b)(2). However, special masters are empowered to determine the format for taking evidence based on the circumstances of each case. Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1).

In this case, petitioner has alleged that he suffered multiple sclerosis, either caused-in-fact or significantly aggravated by the Menactra vaccine. Because multiple sclerosis is not listed on the Vaccine Injury Table, petitioner must satisfy the above-described *Althen* or *Loving* tests for establishing causation-in-fact or significant aggravation.

## II. Procedural History

This case was initially assigned to another Special Master. (ECF Nos. 4, 15-16.) After filing the petition, petitioner filed medical records, an affidavit, and an initial statement of completion in April of 2020. (ECF Nos. 6-8, 10; Exs. 1-16.) Thereafter, petitioner filed additional medical records and a second statement of completion in May of 2020. (ECF Nos. 12, 14; Ex. 17.)

Respondent filed a Rule 4(c) Report on October 26, 2020, recommending against compensation. (ECF No. 20.) Respondent argued that petitioner had not offered a reputable scientific or medical theory establishing that the meningococcal vaccine can cause multiple sclerosis or that it did so in this case. (*Id.* at 8-10.) Petitioner then filed additional medical records (ECF No. 24; Ex. 18) and an expert report by neuroimmunologist Lawrence Steinman, M.D. (ECF Nos. 29-32; Exs. 19-45). Respondent filed responsive expert reports by neurologist Gregory L. Holmes, M.D. and immunologist J. Lindsay Whitton, M.D., Ph.D. (ECF Nos. 35-36; Exs. A-D.)

The case was reassigned to the undersigned on February 4, 2022. (ECF Nos. 38-39.) Thereafter, petitioner filed a supplemental expert report by Dr. Steinman In March of 2022 (ECF Nos. 40-41; Exs. 46-49), and respondent filed supplemental reports by Dr. Holmes and Dr. Whitton in June of 2022 (ECF Nos. 44-45; Exs. E-F). A further report by Dr. Steinman was filed in September of 2022, followed by an additional report by Dr. Holmes in December of 2022. (ECF Nos. 49, 52; Exs. 50-54, G.)

A two-day entitlement hearing commenced on November 13, 2024. (ECF No. 55; Transcript of Proceeding ("Tr."), at ECF Nos. 83-84.) Thereafter, the parties jointly waived post-hearing briefs. (ECF No. 85.)

## III. Factual History

### a. Medical Records

Before receiving the vaccine at issue in this case, petitioner had a history of urinary incontinence. (Ex. 7, pp. 43-53, 323-26; Ex. 15, pp. 63-69.) Petitioner had almost a lifelong history of nighttime urinary incontinence; however, at a urology evaluation in 2016, petitioner reported that he had started to experience episodes of daytime urinary incontinence as well. (Ex. 15, p. 63.) During this time, petitioner's labs showed high creatine, potassium, and alkaline phosphatase. (Ex. 7, pp. 21-24.) Petitioner received his first dose of the Menactra vaccine on October 21, 2016. (*Id.* at 39, 323-26.) In May of 2017, petitioner presented to urgent care on two occasions, first for dehydration and vomiting, and then for splinter removal. (*Id.* at 54-63.) Petitioner had medical encounters for ear pain and an upper respiratory infection, as well as an urgent care visit for a left ear infection in July of 2017. (*Id.* at 64-65, 304-06, 309-11.)

Petitioner received the second Menactra vaccine, the vaccine at issue in this case, on January 11, 2018, during a routine visit with his pediatrician, Deborah Salom, M.D. (Ex. 7, pp. 39, 320-22.) Dr. Salom noted that petitioner continued to experience urinary incontinence and was advised by urology to do pelvic floor exercises. (*Id.* at 321-22.) No other health concerns were documented at this encounter. (*See id.* at 322.)

On January 27, 2018, petitioner returned to Dr. Salom complaining of a two-day history of vomiting and reports of double vision, blurred vision, and numbness on the right side. (Ex. 7, p. 318.) He denied experiencing weakness, diarrhea, and fever. (*Id.*)

Petitioner's physical exam revealed tachycardia but was otherwise unremarkable with no right-sided hypoesthesia, normal reflexes, and full strength and range of motion in the extremities. (*Id.* at 318-19.) Dr. Salom diagnosed petitioner with unspecified noninfective gastroenteritis and colitis, and instructed petitioner to continue taking Zofran and encouraged fluids. (*Id.* at 319.)

On January 30, 2018, petitioner presented to El Camino Hospital's emergency department reporting a five-day history of clumsiness, numbness, tingling in his right arm, weakness in his right leg, and double vision. (Ex. 1, p. 5.) Petitioner denied fever, abdominal pain, and headache. (*Id.*) On physical exam, petitioner walked with a limp, appeared to be weak on his right leg, was ataxic with his right upper and lower extremities, and had a slight decrease in sensation. (*Id.*) Petitioner also complained of double vision when he looked sideways in both directions, but no clinically extraocular movement palsy was observed on exam. (*Id.*) He underwent an MRI of the brain that showed "[s]evere white matter disease." (*Id.* at 15-16.) Specifically, the scan revealed

> [e]xtensive increased signal seen throughout the white matter bilaterally within the periventricular region involving the frontal parietal as well as temporal lobes. There is a prominent focus of increased signal also seen within the pons on the left within the middle cerebellar peduncle. These findings are highly suspicious for demyelinating disease. This could be due to multiple sclerosis.

(*Id.* at 16.) Petitioner's MRI of the cervical spine was normal. (*Id.* at 5, 16-18.) Due to El Camino Hospital's lack of a pediatric ICU, petitioner was subsequently transferred later that day to Good Samaritan Hospital with a working diagnosis of acute disseminated encephalomyelitis ("ADEM"). (*Id.* at 5-6; Ex. 6, pp. 6-7.)

Upon his transfer to Good Samaritan Hospital, the admitting physician documented that four days ago, petitioner "started vomiting and had slight loose stools." (Ex. 6, p. 6.) As those symptoms started to resolve, petitioner began experiencing tingling in his right hand and legs, "and a little bit of neurologic change," described as "clouded sensorium." (*Id.*) While petitioner had no fever, his symptoms were dramatic enough that he presented for medical attention. (*Id.*) The admitting physician noted petitioner's MRI results and explained that petitioner's "working diagnosis because of his age and because of the apparent viral prodrome is ADEM, acute demyelinating encephalomyelitis; however multiple sclerosis is also a possibility." (*Id.*) Per neurology's recommendation, the plan was to start petitioner on high-dose IV steroids for treatment of suspected ADEM and obtain a spinal tap. (*Id.* at 6-7.)

Petitioner had a pediatric neurology consult with Ted Guarino, M.D., on January 31, 2018. (Ex. 6, pp. 11-13.) Dr. Guarino recorded that petitioner had experienced symptoms "of a viral syndrome including some nausea, upset stomach, and some emesis" during the week prior. (*Id.* at 11.) As he started to improve, "he began to experience a sort of tingling feeling or numbness in the right upper and lower extremity." (*Id.*) Petitioner's mother noticed that petitioner needed to lean on her for balance when

walking due to weakness on his right side, dizziness, and double vision. (*Id.*) Dr. Guarino reviewed petitioner's MRI and noted that it showed "scattered white matter lesions over both hemispheres and involving the pons." (*Id.*) Dr. Guarino noted petitioner's history of bedwetting and explained that he had some accidents while in the ICU. (*Id.* at 11-12.) On physical exam, petitioner reported some double vision and dizziness, and he exhibited some unsteadiness when walking. (*Id.* at 12.) Dr. Guarino documented petitioner's reflexes at 2.5+, symmetrically, and that petitioner had some dysmetria and mild tremor on the right side. (*Id.*) Petitioner subjectively reported decreased light touch to the right side of his face and right-sided extremities. (*Id.*) He noted that petitioner was responding well to his steroid treatment. (*Id.*) Additionally, Dr. Guarino documented that petitioner underwent a spinal tap that was submitted for a multiple sclerosis panel. (*Id.*) Overall, Dr. Guarino recorded that petitioner's "clinical presentation is most consistent with acute disseminated encephalomyelitis. Much less likely would be multiple sclerosis." (*Id.*)

On February 1, 2018, petitioner was reevaluated by Dr. Guarino. (Ex. 6, pp. 16-17.) Dr. Guarino documented that petitioner still required support while walking due to unsteady gait and dizziness. (*Id.* at 16.) Additionally, he noted that petitioner was doing well on his high-dose of steroids and that the tingling sensation on the right side of his body had improved, though some residual tinging persisted in petitioner's hand. (*Id.*) The differential diagnosis remained ADEM versus multiple sclerosis, with ADEM still being the favored diagnosis given petitioner's clinical presentation. (*Id.*)

Petitioner continued to improve over the next few days and received physical, occupational, and speech therapy; however, he still experienced some tingling in his right hand and unsteadiness on his feet, and his differential diagnosis remained post-infectious ADEM. (Ex. 6, pp. 18-24, 139-41, 155-59, 163-65, 179-84, 197, 199-200, 204-05, 216-17, 219-21.) Petitioner's multiple sclerosis labs remained pending. (*Id.* at 18-24.)

On February 5, 2018, petitioner was evaluated again by Dr. Guarino. (Ex. 6, pp. 14-15.) Petitioner's right-sided numbness and tingling had markedly improved; however, he did have some residual tingling in his right foot, as well as continued subjective decreased light touch over the right side of his body. (*Id.* at 14.) Dr. Guarino documented that petitioner continued to experience episodes of dizziness with movement and still required support when walking. (*Id.*) Additionally, he recorded that petitioner continued to experience periodic urinary incontinence. (*Id.*) Dr. Guarino remarked that petitioner had successfully transitioned to oral prednisone with a plan for a gradual taper over the next six to eight weeks. (*Id.* at 14-15.) His assessment remained probable ADEM. (*Id.* at 14.) Petitioner was discharged later that day and transferred to an inpatient rehabilitation facility for ongoing physical therapy. (*Id.* at 4-5, 15.) Petitioner's discharge summary listed "[r]ight-sided weakness with hemisensory loss" and "presumed ADEM" as the final diagnoses. (*Id.* at 4.) Petitioner's multiple sclerosis panel remained pending at the time of discharge. (*Id.*)

Upon transfer to the rehabilitation facility, the admitting physician documented that petitioner was recovering from ADEM. (Ex. 4, pp. 198-200.) On physical exam, petitioner had decreased sensation on the right side of his face and body as compared to the left, hyperreflexia of the right knee, and unstable gait. (*Id.* at 200.) Petitioner was evaluated by physical and occupational therapy at the rehabilitation center on February 6, 2018. (*Id.* at 59-64, 70-75.) During his occupational therapy evaluation, it was reported that petitioner had "[d]ecreased independence with functional mobility, [d]ecreased independence with ADLs." (*Id.* at 62.) Petitioner's physical therapy evaluation revealed decreased strength in his lower extremities bilaterally. (*Id.* at 72-73.) Additionally, petitioner was assessed with "impaired sensation/proprioception, decreased balance and fatigue (notic[e]able increased [work for breathing] with increased ambulation distance and stairs)," in addition to having functional limitations with "transfers, sitting balance, standing balance, gait, functional endurance, stair climbing and at fall risk." (*Id.* at 74.) Petitioner was also evaluated by a speech and language pathologist. (*Id.* at 76-77.)

Petitioner continued physical, aquatic, occupational, and speech and language therapies until he was discharged on February 13, 2018. (Ex. 4, pp. 38-58, 84-119, 166-67, 170-73, 219-32, 181-85.) Petitioner's occupational and physical therapy discharge summary reported improvement with petitioner's balance, coordination, and indicated he was able to complete basic tasks like eating, dressing, etc. (*Id.* at 114, 176.) Petitioner's speech pathology discharge summary reported that petitioner made gains in comprehension, expression, problem solving, and memory. (*Id.* at 174.) It was noted that petitioner's spinal tap results showed 11 oligoclonal bands in the CSF, but not in the serum, which the discharging physician indicated was of "unclear significance in setting of presumed ADEM." (*Id.* at 202; *see also* Ex. 6, p. 79.) Petitioner was instructed to follow up with Dr. Guarino. (Ex. 4, p. 202.)

After his discharge on February 13, 2018, petitioner had a follow up appointment with Dr. Salom later that day. (Ex. 7, p. 316.) Dr. Salom summarized petitioner's hospitalization and noted that he planned to continue with occupational, physical, and speech therapy on an outpatient basis. (*Id.*) She listed ADEM as her assessment. (*Id.* at 317.)

Petitioner had a neurology follow up appointment with Dr. Guarino on February 16, 2018. (Ex. 3, pp. 1-4.) Dr. Guarino noted that petitioner had suffered an episode of ADEM. (*Id.* at 1.) Petitioner continued to report mild balance issues but explained that his strength had returned to normal. (*Id.*) Dr. Guarino documented that petitioner's labs revealed normal white blood cell count, protein, and glucose levels; however, petitioner's oligoclonal bands, IgG synthesis, and myelin basic protein were elevated. (*Id.*) He explained that "[s]ome of these markers can be seen in ADEM but of course they also raise suspicion for multiple sclerosis." (*Id.*) Accordingly, Dr. Guarino referred petitioner to the pediatric multiple sclerosis clinic at the University of California, San Francisco ("UCSF"). (*Id.* at 4.) Dr. Guarino remarked that petitioner was "doing really well on his prednisone taper," noting that his primary symptom on physical exam was mild ataxia with tandem walk. (*Id.* at 3.) Petitioner's diagnosis remained ADEM. (*Id.*)

On February 20, 2018, petitioner presented to his primary care clinic and was evaluated by Michael Wolfe, M.D. (Ex. 7, pp. 327-29.) He complained of abdominal cramps, mild nausea, bloating, some shortness of breath, and somewhat loose bowel movements. (*Id.* at 327.) Dr. Wolfe documented that petitioner's mother reported that petitioner likely had an allergy to the Menactra vaccine, noting that petitioner had been in the ICU for vaccine-related ADEM. (*Id.*) On physical exam, petitioner's abdomen was soft, non-tender, and mildly distended with normal to slightly decreased bowel sounds. (*Id.* at 328.) Dr. Wolfe assessed petitioner with generalized edema secondary to his ADEM. (*Id.*) He attributed petitioner's fluid retention to his high-dose steroids and instructed petitioner to take Zofran as needed for his nausea. (*Id.*)

Petitioner presented for a chiropractic evaluation on March 2, 2018. (Ex. 58, pp. 42-44.) In documenting petitioner's history, the chiropractic provider noted that petitioner had "[v]accine reaction (ADM) [sic] on January 11th." (*Id.* at 42.) The provider noted that petitioner was hospitalized for encephalitis, and that he was experiencing "overall body tightness" from physical therapy and being bedridden during his hospitalization. (*Id.*) Petitioner explained that he was currently in physical and occupational therapy; however, he continued to experience tightness due to his condition and physical therapy. (*Id.*) Petitioner was assessed with abnormal posture, idiopathic scoliosis of thoracic region, and segmental and somatic dysfunction of the cervical, thoracic, lumbar, and pelvic regions. (*Id.* at 43.)

On March 6, 2018, petitioner presented to UCSF Pediatric Multiple Sclerosis Clinic where he was evaluated by neurologist Emmanuelle Waubant, M.D., with neurology resident Sharon Wietstock, M.D. (Ex. 7, pp. 244-50.) Dr. Waubant documented that petitioner was a previously healthy 13-year-old child who was referred to the clinic by Dr. Guarino for evaluation of demyelinating disease. (*Id.* at 244.) In documenting petitioner's history, Dr. Waubant recorded that in December of 2017, petitioner started to feel off balance in his right leg, noting that it felt like swaying. (*Id.*) Petitioner's parents observed petitioner walking in an uncharacteristically "bouncy" manner around that time. (*Id.*) After receiving his Menactra vaccine on January 11, 2018, petitioner's mom reported that petitioner demonstrated anxiety and difficulty completing schoolwork, although it was noted that this was an issue for petitioner to some extent at baseline. (*Id.*) Around January 25, 2018, petitioner started to experience blurriness in his right eye and double vision, which was followed by an episode of nausea and vomiting. (*Id.*) Upon resolution of the nausea and vomiting, petitioner started to experience numbness, tingling, and weakness in his right-sided upper and lower extremities, as well as fatigue and exhaustion. (*Id.*) Although petitioner's primary care doctor initially thought petitioner's symptoms were attributed to a viral illness, petitioner's symptoms persisted, leading to his hospitalization and a working diagnosis of ADEM. (*Id.* at 244-45.) Petitioner reported that his symptoms returned to baseline after he underwent a five-day course of high-dose IV steroids and a gradual oral prednisone taper. (*Id.* at 245.)

At the time of his appointment with Dr. Waubant, petitioner reported a one-to-two-week history of urinary urgency, describing his current symptoms as distinct from his longstanding history of urinary incontinence. (Ex. 7, p. 245.) He also complained of increased headaches. (*Id.*) While he started experiencing a few headaches per year in elementary school, petitioner reported that he experienced daily headaches while hospitalized and one to two headaches per week presently. (*Id.*) Petitioner's mother indicated that petitioner's headaches appear to be quite mild, noting that petitioner had not received medication or medical intervention for his headaches in the past. (*Id.*) Lastly, petitioner reported occasional blurred vision bilaterally that resolves after a few seconds, as well as acne since initiation of steroids. (*Id.*) Petitioner's neurologic examination was significant for "timid demeanor, break down in saccades with R gaze, mild diminished sensation to light touch, temperature, and vibration of the RUE and RLE, and some difficulty with tandem gait." (*Id.* at 246-48.) Dr. Waubant documented that petitioner's exam findings suggested that his symptoms had not fully resolved despite a long prednisone taper. (*Id.* at 248.)

After evaluating petitioner and reviewing his records and history, Dr. Waubant opined that petitioner "meets diagnostic criteria for relapsing-remitting [multiple sclerosis] because he is greater than 12 [years old] and experienced an acute event that does not meet ADEM criteria (no encephalopathy) and whose MRI findings are consistent with the 2017 McDonald criteria for dissemination in space and dissemination in time." (Ex. 7, p. 248.) Additionally, Dr. Waubant documented that it is unclear if the worsening of petitioner's urinary incontinence two years ago was related to his multiple sclerosis, indicating it could have been an initial relapse. (*Id.*) Given petitioner's new or exaggerated urinary symptoms, Dr. Waubant ordered an MRI of the thoracic spine to assess for evidence of possible demyelination. (*Id.* at 248-49.) Dr. Waubant also ordered serum testing to rule out other conditions that can mimic multiple sclerosis. (*Id.* at 249.)

The next day, petitioner presented to outpatient speech pathology. (Ex. 16, pp. 14-18.) Petitioner underwent a thorough evaluation, which revealed limitations in his communication and cognitive communication skills, including "organization of thought, pragmatics (social communication and language within conversation), processing speed, abstract language skills, and verbal fluency." (*Id.* at 17.) The speech language pathologist noted that throughout the evaluation, petitioner was observed to speak with varying levels of vocal intensity, often starting with a louder voice that would gradually diminish in intensity. (*Id.*) Glottal fry was observed due to decreased breath support. (*Id.*) Petitioner's decreased loudness and resulting decreased speech intelligibility was noted to impact his social interactions during the evaluation. (*Id.*) Outpatient speech pathology treatment was recommended. (*Id.* at 18.)

Petitioner underwent an MRI of his thoracic spine on March 12, 2018, which was normal, except for mild thoracolumbar scoliosis. (Ex. 7, p. 196; Ex. 2, pp. 126, 129-30.) On March 14, 2018, petitioner had a follow up appointment with Dr. Guarino. (Ex. 3, p. 10.) At this encounter, petitioner reported that he was nearly back to normal; however, his mother expressed concerns regarding petitioner's attention and ability to focus. (*Id.*)

On physical exam, petitioner was able to logically communicate but seemed "a little bit disinhibited or silly" at times. (*Id.* at 12.) Tandem walk remained somewhat difficult for petitioner. (*Id.*) Dr. Guarino documented that petitioner's evaluation at UCSF multiple sclerosis clinic indicates that petitioner most likely suffers from multiple sclerosis. (*Id.*) Accordingly, multiple sclerosis was listed as the diagnosis for the encounter. (*Id.*) Dr. Guarino instructed petitioner to finish his prednisone taper and to follow up with UCSF multiple sclerosis clinic for further management of his condition. (*Id.*)

Petitioner followed up with Dr. Waubant and her resident, Dr. Wietstock, on March 20, 2018. (Ex. 2, pp. 126-33.) Petitioner reported that, since his last visit with Dr. Waubant, he had completed his steroid taper and had been doing well. (*Id.* at 126.) Dr Wietstock noted that petitioner's MRI of the thoracic spine was normal and that the serum studies to rule out multiple sclerosis mimics were negative. (*Id.*) Petitioner's neurological exam was significant for timid demeanor and mild diminished sensation to light touch and temperature of the right-sided extremities, which had nearly resolved. (*Id.* at 128-30.) Dr. Wietstock documented that petitioner's tandem gait was now stable. (*Id.* at 130.) Petitioner's diagnosis remained relapsing-remitting multiple sclerosis. (*Id.*) Dr. Wietstock and Dr. Waubant reviewed and discussed different therapy options with petitioner and his mother. (*Id.* at 130-33.)

Petitioner continued with outpatient speech language pathology and physical therapy. (Ex. 16, pp. 19-20.) On March 27, 2018, petitioner presented to physical medicine and rehabilitation where he was evaluated by Lyly Chiou, M.D., for continued rehabilitation for his multiple sclerosis. (Ex. 4, pp. 29-32.) Petitioner reported that he had been doing well; however, his right foot occasionally catches, causing him to stumble. (*Id.* at 29.) After completing a thorough exam, Dr. Chiou documented that petitioner continues to experience decreased endurance, dysarthria, and mild cognitive deficits. (*Id.* at 32.) Petitioner was instructed to continue with rehabilitation therapy, and he was referred to behavioral health for occasional sadness. (*Id.* at 29, 32.)

On April 3, 2018, petitioner had a telehealth appointment with Dr. Waubant to discuss initiating therapy for his multiple sclerosis. (Ex. 2, pp. 133-35.) Dr. Waubant reported that petitioner had "relapsing-remitting [multiple sclerosis] with large lesion load." (*Id.* at 134.) Petitioner's family indicated they were interested in starting petitioner on rituximab. (*Id.*) On the intake form for initiating rituximab therapy dated April 25, 2018, pediatric neuroimmunologist Carla Francisco, M.D., documented that review of petitioner's medical records indicated that petitioner had experienced "at least two clinical events," with the first occurring in December of 2017 when he had an episode of balance issues and changes in his gait, and the second occurring in January of 2018 when he experienced double vision, right-sided blurry vision, and numbness, tingling, and weakness in his right arm and leg. (*Id.* at 85, 87.)

On May 11, 2018, petitioner was admitted for his first of two rituximab infusions. (Ex. 2, pp. 2-19.) It was noted that since petitioner's last neurology examination on March 20, 2018, petitioner had been doing well but was experiencing intermittent numbness in his right hand. (*Id.* at 10, 12.) He was discharged the next day. (*Id.* at 4.)

Petitioner was admitted for a second course of rituximab on May 24, 2018. (*Id.* at 69-84, 90.)

Petitioner underwent evaluations for school accommodations and an IEP was put into place. (*See generally* Ex. 5.) His evaluation revealed deficits in processing speed and cognitive fluency, among other issues. (*Id.* at 55-57.) The evaluators noticed that through petitioner's diagnosis of multiple sclerosis and his concurrent deficits in processing speed and cognitive fluency, he demonstrates evidence of "limited strength, vitality or alertness, or heightened alertness that adversely affects his educational performance at this time." (*Id.* at 57.)

Petitioner had a follow up appointment with Dr. Waubant and Alice Rutatangwa, D.O., on July 31, 2018. (Ex. 2, pp. 136-40.) At this encounter, petitioner reported experiencing 4-5 days of lethargy and body achiness after his rituximab infusions; however, he reported being stable in terms of his multiple sclerosis. (*Id.* at 137.) On physical exam, petitioner demonstrated slightly decreased reflexes in the bilateral biceps and mildly diminished sensation to light touch and temperature of the right lower extremity from above the ankle to mid-shin. (*Id.* at 137-38.) Petitioner was instructed to continue with rituximab infusions every six months. (*Id.* at 139.)

On October 1, 2018, petitioner presented to neuroimmunologist Kieth Van Haren, M.D., for a consultation regarding the diagnosis and management of his multiple sclerosis. (Ex. 16, pp. 29-33.) After petitioner's mother provided an overview of petitioner's history, Dr. Van Haren documented that petitioner's multiple sclerosis symptoms "stretch back several years." (*Id.* at 29-30, 32.) He noted that petitioner's mother reported that, in the summer of 2016, petitioner "began having occasional daytime bladder incontinence, losing control often without awareness." (*Id.* at 29.) In May of 2017, petitioner received the HPV vaccine and experienced fatigue, malaise, vomiting, and patchy numbness that was diagnosed as norovirus. (*Id.*) In the fall of 2017, petitioner's mother observed that petitioner "seemed to be toe-walking a bit on both feet," and noted that petitioner demonstrated gait imbalance and leg swaying with the right more than the left in December of 2017. (*Id.* at 29-30.) After receiving the second dose of the Menactra vaccine in January of 2018, petitioner experienced blurry and double vision in the right eye; nausea and vomiting; anxiety; right-sided numbness, tingling, and weakness of the extremities; and fatigue. (*Id.*) Dr. Van Haren listed this multi-year history as symptomology consistent with multiple sclerosis. (*Id.* at 30.) Petitioner's physical exam revealed a slight decrease in petitioner's right hip flexor motor skills, hyperreflexia with beats of clonus in the right ankle, unsteady coordination when using left leg, and a moderately unsteady tandem walk. (*Id.*) Dr. Van Haren assessed petitioner with relapsing-remitting multiple sclerosis, noting that petitioner's "lesion burden is relatively heavy for age and known duration of disease." (*Id.* at 32.)

On October 9, 2018, petitioner had a telephone visit with Dr. Rutatangwa Dr. Francisco to discuss petitioner's baseline MRI after starting rituximab, which was performed on September 29, 2018. (Ex. 7, p. 266.) Dr. Rutatangwa reported that petitioner's MRI showed a few new lesions when compared to petitioner's MRI from

January 20, 2018; however, Dr. Rutatangwa noted that these could be due to differences in technique between the two MRIs. (*Id.*) On February 7, 2019, petitioner underwent an MRI of the brain that showed "[g]rossly unchanged burden of demyelinating disease," though there were no new lesions. (Ex. 16, p. 42.)

Petitioner had a follow up appointment with Dr. Waubant on March 12, 2019. (Ex. 7, pp. 293-98.) Dr. Waubant recorded that petitioner was doing well and continued to tolerate his rituximab infusions. (*Id.* at 294.) His neurological exam was normal, except for reduced reflexes in his bilateral biceps and mildly diminished sensation to temperature and light touch of the right lower extremity from above the ankle to mid-shin. (*Id.* at 295.) On August 6, 2019, petitioner followed up with Dr. Van Haren. (Ex. 15, pp. 54-61.) Dr. Van Haren remarked that while petitioner still reported experiencing fatigue, anxiety, and mild unsteadiness, petitioner had demonstrated "great improvement in his neurological symptoms compared to the year prior." (*Id.* at 54.) Petitioner's neurological exam was normal, except for slight unsteadiness on tandem gait. (*Id.* at 54, 56-57.) Dr. Van Haren documented that petitioner continued to receive rituximab infusions.

Petitioner filed additional records for encounters occurring in 2019 through 2023, which demonstrate that petitioner's multiple sclerosis was relatively controlled, although petitioner continued to experience occasional relapses of his neurological symptoms. (*E.g.*, Ex. 58, p. 653 (October 4, 2021 encounter documenting that petitioner has occasional clumsiness and sporadic arm numbness); *id.* at 495 (July 25, 2022 encounter noting that petitioner reported balance issues and transient episodes of parasthesias in the upper right and lower left extremities).) Petitioner has received regular rituximab infusions since 2018. (*Id.* at 368-69.)

**b. Testimony**

Petitioner's mother, Andrea Anderson, provided an affidavit and testified at the entitlement hearing. (Ex. 9; Tr. 6.) Ms. Anderson maintained that until petitioner reached 13 years of age, he was a healthy and active child with no health concerns or issues other than urinary incontinence. (Ex. 9, ¶ 2; Tr. 8-9.) She explained that petitioner struggled with lifelong nighttime incontinence. (Ex. 9, ¶ 2; Tr. 9.) However, around 2016, petitioner started to experience urinary incontinence during the daytime as well. (Ex. 9, ¶ 3; Tr. 9.) Petitioner was evaluated by a urologist, which revealed no concerning clinical findings, and the issue of daytime urinary incontinence eventually resolved. (Ex. 9, ¶ 3; Tr. 9-11.)

Ms. Anderson testified that in late 2017, she noticed that petitioner began to walk differently, describing his gait as "more bouncy." (Tr. 11-12, 27-28, 33; Ex. 9, ¶ 4.) She recalled petitioner exhibiting a bouncy walk when climbing the stairs at their home, noting that she noticed him "shuffling" or "kicking" a rug on the landing. (Ex. 9, ¶ 4; Tr. 11-12.) Additionally, Ms. Anderson mentioned that she observed petitioner "would sort of jump and bounce" when walking on pavers, appearing to try to either land on or avoid the edges of the stones. (Ex. 9, ¶ 4; Tr. 11-12.) However, Ms. Anderson stated that

she was not too concerned about these observations and had no reason to suspect that petitioner's change in gait was neurological at that time. (Tr. 28; *see also* Ex. 9, ¶¶ 4-5.)

On January 11, 2018, Ms. Anderson took petitioner to his pediatrician, Dr. Salom, for his annual checkup, at which time he received the Menactra vaccine. (Ex. 9, ¶ 5; Tr. 12-13.) At that time, she did not have any concerns regarding petitioner's development and health, other than his ongoing nighttime urinary incontinence. (Ex. 9, ¶ 5.) For the first two weeks after this appointment, petitioner seemed to be his normal self. (Tr. 13.) However, around January 25, 2018, petitioner became ill, experiencing vomiting and fatigue. (*Id.*; Ex. 9, ¶ 6.) While Ms. Anderson recalled that petitioner seemed "feverish," she testified that he did not have an elevated temperature. (Tr. 13.) While she acknowledged that one of petitioner's medical records indicates he reported slight loose stools, Ms. Anderson testified that petitioner did not experience diarrhea. (*Id.* at 19-20.) Petitioner subsequently complained of blurred and double vision, as well as numbness and tingling on the right side of his body. (Ex. 9, ¶ 6; Tr. 13, 18-19.) Ms. Anderson also recalled petitioner experiencing clumsiness due to the numbness and weakness he was experiencing in his extremities. (Tr. 35-36.) Accordingly, petitioner returned to Dr. Salom, who informed Ms. Anderson that petitioner had a stomach bug and recommended that petitioner focus on rest and rehydration. (*Id.* at 13-14; Ex. 9, ¶ 7.) Ms. Anderson testified that when petitioner's symptoms continued to persist, she called Dr. Salom's office and was advised to bring petitioner to the emergency department. (Tr. 14; Ex. 9, ¶ 7.)

Ms. Anderson discussed petitioner's emergency room encounter and subsequent hospitalization and inpatient rehabilitation. (Tr. 14-18, 20-21.) She stated that while petitioner was in the emergency department, he underwent an MRI of his brain which revealed active lesions and led to his initial diagnosis of ADEM. (Ex. 9, ¶ 8; Tr. 14-17.) Additionally, she testified about petitioner's neurology encounters following his hospitalization and inpatient rehabilitation, specifically discussing petitioner's initial evaluation with Dr. Waubant who concluded that petitioner had multiple sclerosis, not ADEM. (Tr. 23-25.) After receiving the diagnosis of multiple sclerosis, Ms. Anderson recalled taking petitioner to Dr. Van Haren for a second opinion. (*Id.* at 25-26.) She explained that at this encounter, Dr. Van Haren asked Ms. Anderson to discuss minor and major events and observations related to petitioner's development and health. (*Id.* at 26-29.)

In addition, Ms. Anderson provided testimony about how petitioner's multiple sclerosis has impacted petitioner's life generally. (Tr. 29-31.) Ms. Anderson explained that following inpatient rehabilitation, petitioner spent about two months at home where he received homeschooling. (*Id.* at 22, 29-30.) When he returned to school, petitioner was placed on an IEP. (*Id.* at 30.) Ms. Anderson averred petitioner "was not his old self," stressing that petitioner struggled to think straight and was not as creative as he had previously been. (*Id.*) She also recalled that petitioner struggled with his stamina and fatigue, noting that he needed a lot more sleep, which resulted in a significant reduction in his load of extracurricular activities. (*Id.*) Ms. Anderson explained that this

continued throughout high school, stating that petitioner "had to adjust to the new normal and take it from there." (*Id.*)

Ms. Anderson averred that petitioner's multiple sclerosis requires medical management, noting that petitioner has been receiving rituximab infusions at a usual rate of twice per year since May of 2018. (Tr. 25; Ex. 9, ¶ 17.) Additionally, she maintained that petitioner continues to experience symptoms of his multiple sclerosis. (Tr. 31.) He continues to struggle with fatigue and stamina, and Ms. Anderson explained that petitioner easily develops neurological symptoms when he does not get enough sleep. (*Id.*) She also stated that petitioner was experiencing facial twitches. (*Id.*) However, she noted that petitioner has not been subsequently hospitalized due to his multiple sclerosis. (*Id.* at 37.)

## IV. Summary of Expert Opinions and Qualifications

### a. Lawrence Steinman, M.D.[4]

Dr. Lawrence Steinman submitted three expert reports and testified on behalf of petitioner in this case. (Exs. 19, 46, 50; Tr. 41.) Dr. Steinman was proffered as an expert in neurology and immunology without objection. (Tr. 49.) Dr. Steinman notes that multiple sclerosis is his main area of focus as a neuroimmunologist. (*Id.* at 43.) After reviewing petitioner's medical history, MR imaging, and spinal tap results, Dr. Steinman concluded petitioner's Menactra vaccination on January 11, 2018 significantly aggravated his preexisting relapsing-remitting multiple sclerosis. (Ex. 19, p. 10; Tr. 50.) More specifically, he opines that the diphtheria toxoid component of the Menactra vaccine triggered via molecular mimicry an immune response to proteins that are known to be attacked in multiple sclerosis thereby leading to petitioner's relapse. (Tr. 92.)

Dr. Steinman explains that multiple sclerosis is a major neuroinflammatory condition that involves the immune system attacking different parts of the brain, typically the white matter. (Tr. 74.) Multiple sclerosis typically develops during young adulthood, although it can present in pediatric patients. (*Id.* at 75.) While there is no single confirmatory test, neurologists rely on the criteria of dissemination in time and in space to support a diagnosis of multiple sclerosis. (*Id.* at 76-77.) There are different types of multiple sclerosis, one of which is relapsing-remitting multiple sclerosis. (*Id.* at 76.) Dr. Steinman opines that the petitioner's ultimate diagnosis of relapsing-remitting multiple sclerosis is correct and appropriate in this case. (*Id.* at 77; Ex. 19, pp. 2, 10.)

---

[4] Dr. Lawrence Steinman is a board-certified neurologist. (Ex. 55, p. 2; Ex. 19, p. 2.) He received his bachelor's degree from Dartmouth College and his medical degree from Harvard University. (Ex. 55, p. 1.) He completed an internship and two residencies, one in pediatrics and one in pediatric and adult neurology, at Stanford University Hospital. (*Id.*) He currently works as a professor in Stanford University's Departments of Neurology and Neurological Sciences, and Pediatrics and Genetics. (*Id.*) Dr. Steinman is actively involved in the treatment and care of patients with neuroinflammatory diseases, including many patients with multiple sclerosis. (Ex. 19, p. 2; Tr. 44-45.) He has authored over 600 peer reviewed articles. (Ex. 55, pp. 5-52.)

Dr. Steinman opines that there is no typical or known trajectory for relapsing-remitting multiple sclerosis, stressing that it is impossible to know how any given case will progress. (Tr. 77-78, 139.) Every case of multiple sclerosis is different and involves a large amount of uncertainty about the future course of the disease. (*Id.* at 78.)

While not definitively known, Dr. Steinman states that the etiology of multiple sclerosis is likely multifactorial, noting that genetics and environmental factors play a role. (Ex. 19, pp. 10-11; Tr. 53-54, 74-75, 79-80.) Research has linked development of multiple sclerosis with infection, specifically with the Epstein-Barr virus ("EBV"); however, given the ubiquity of infection with EBV, Dr. Steinman cautions that the EBV alone is insufficient to trigger multiple sclerosis. (Ex. 50, p. 2; Tr. 46, 53-54, 74-75, 81-82, 129.)

Dr. Steinman explains that prior to the receipt of the Menactra vaccination at issue, petitioner was healthy and had no medical concerns other than his longstanding urinary incontinence. (Tr. 51.) However, approximately two weeks after the vaccination, petitioner started experiencing double vision, right-sided numbness, tingling, and weakness, and an episode of vomiting, which are all symptoms Dr. Steinman attributes to petitioner's his multiple sclerosis. (*Id.* at 55-59 (discussing Ex. 7, p. 318; Ex. 1, p. 5); Ex. 19, pp. 26-27 (citing Ex. 1, p. 5).) Dr. Steinman testified that petitioner's MRI revealed lesions in the pons and in the cerebellar peduncle. (Tr. 369.) He explains that a lesion in the pons could impact the nuclei of cranial nerves that control the eye muscles. (*Id.*) Therefore, Dr. Steinman contends that a lesion in this area of the brainstem could certainly lead to double vision. (*Id.*) Furthermore, the pons is located above the decussation, the point at which the nerve fibers cross to the opposite side within the brain. (*Id.*) Thus, Dr. Steinman maintains that a lesion on the left side of the pons would explain petitioner's right-sided numbness, tingling, and weakness. (*Id.*)

Moreover, while petitioner did not receive this diagnosis until March of 2018, Dr. Steinman agrees with petitioner's treating providers that petitioner developed relapsing-remitting multiple sclerosis prior to his receipt of the Menactra vaccination at issue. (Ex. 19, pp. 9-10; Ex. 46, p. 13; Tr. 52, 153.) He does not necessarily believe that petitioner's urinary incontinence or the "bouncy walk" episode in December of 2017 were manifestations of petitioner's relapsing-remitting multiple sclerosis. (Tr. 51-52, 153.) However, he explained that his assessment that petitioner's relapsing-remitting multiple sclerosis predated the vaccination does not depend on whether any of petitioner's prior symptoms were related to the multiple sclerosis. (*Id.* at 54.) Rather, he testified that the extensive radiologic evidence, including petitioner's initial MRI, indicate that petitioner's relapsing-remitting multiple sclerosis had likely been ongoing for more than the two weeks between the vaccination at issue and the onset of petitioner's symptoms. (*Id.* at 54-55.) Although he acknowledges that petitioner's initial MRI was without contrast, Dr. Steinman states that the scan revealed extensive lesions which support a conclusion that the onset of petitioner's multiple sclerosis predated the Menactra vaccination. (*Id.* at 54-55, 70.)

Dr. Steinman disagrees with the suggestion by Dr. Holmes that petitioner's relapse reflects a natural progression of relapsing-remitting multiple sclerosis, rather than a significant aggravation of petitioner's condition. First, he reiterates that there is no typical way in which multiple sclerosis develops and progresses. (Tr. 90.) Second, Dr. Steinman disagrees with Dr. Holmes's argument that petitioner's relapse in late January of 2018 does not constitute a significant aggravation because petitioner experienced new symptoms with corresponding new lesions. (Ex. 50, pp. 2-3.) He explains that multiple sclerosis relapses "do not necessarily recapitulate a previous attack in their anatomic distribution," meaning that the distribution of the antigen attacked is not necessarily "uniform throughout the brain," and different areas of the brain and spinal cord can be attacked at different times. (*Id.*)

In opining that petitioner suffered a significant aggravation of his relapsing-remitting multiple sclerosis, Dr. Steinman emphasizes that petitioner had no clinical manifestations of his condition pre-vaccination. (Tr. 72, 85, 141.) Even assuming petitioner's urinary incontinence and gait changes in December of 2017 were related to his multiple sclerosis, Dr. Steinman argues that petitioner's pre-vaccination condition does not compare to the "train wreck" that hit petitioner after vaccination. (*Id.* at 52, 87.) He emphasizes it was not until petitioner experienced his relapse that he was eventually able to receive his diagnosis of multiple sclerosis. (Ex. 19, p. 10; Tr. 87.) He contends that petitioner's post-vaccination state constitutes "a tremendous change in [his] pre-vaccine course" (Tr. 87), noting that petitioner required "treatment with powerful immune suppressive medications," including a long course of steroids and rituximab (Ex. 19, p. 10). Moreover, Dr. Steinman stresses that petitioner has not returned to his pre-vaccination condition, noting that petitioner continues to experience fatigue and sensory problems and still requires treatment with powerful disease-modifying drugs to manage his multiple sclerosis. (Tr. 87, 90.) Accordingly, Dr. Steinman concludes that petitioner suffered a significant aggravation of his relapsing-remitting multiple sclerosis. (*Id.* at 90; Ex. 19, p. 10.)

Based on his review of the medical records, Dr. Steinman additionally contends that there is not preponderant evidence that petitioner suffered a viral infection immediately preceding the onset of his relapse. (Tr. 62-63, 385-86.) He stresses that there is no evidence of fever, diarrhea, or abdominal pain, which cuts against a finding of a viral illness. (*Id.* at 56, 58-59, 62-63, 153-55, 386.) Dr. Steinman concedes that one of the medical records include documentation indicating that petitioner experienced "slight loose stools" around the onset of his symptoms. (*Id.* at 153-55.) However, he testified that a report of slight loose stools is not necessarily indicative of diarrhea. (*Id.* at 154.) Dr. Steinman contends that this single documentation alone does not warrant a conclusion that petitioner was experiencing diarrhea, noting that there are too many negatives to support such a finding. (*Id.*) While he acknowledges that petitioner's pediatrician initially diagnosed him with noninfective gastroenteritis and colitis, Dr. Steinman opines that the diagnosis is inaccurate given that petitioner was not experiencing abdominal pain or diarrhea. (*Id.* at 58.) He also recognizes that petitioner's hospital discharge summary includes documentation indicating that petitioner had a history of a recent viral infection. (*Id.* at 62-64 (discussing Ex. 6, pp. 4,

83).) Given that ADEM was the favored diagnosis at that time, Dr. Steinman states it was not unreasonable to include that documentation, although he reiterates his disagreement with the finding of a viral infection. (*Id.*) Moreover, he emphasizes that petitioner's cerebrospinal fluid underwent extensive workup looking for viruses, bacteria, and fungi, but the testing was unremarkable. (*Id.* at 63-64, 126-27, 140.) Dr. Steinman questions how an unconfirmed and unknown virus that was never detected despite rigorous exploration could be viewed as an alternative explanation for petitioner's relapse. (*Id.* at 140; Ex. 50, p. 2.)

Furthermore, Dr. Steinman contends that petitioner's vomiting, a symptom Dr. Holmes attributes to a viral illness, can be explained by his multiple sclerosis. (Tr. 56-57, 60-61, 141, 156-57, 370, 385.) First, he opines that petitioner's documented double vision, a symptom of his relapse, could have caused vomiting. (*Id.* at 56-57, 141, 385.) Dr. Steinman maintains that nausea and vomiting are commonly experienced in individuals with a sensitivity to double vision. (*Id.* at 56-57, 141, 156.) Second, Dr. Steinman testified that brainstem lesions located near the vomiting center can activate a vomiting response. (*Id.* at 56-57, 60-61, 385.) He explains that petitioner's initial MRI on January 30, 2018 revealed lesions in the pons and the middle cerebellar peduncle. (*Id.* at 60-61 (discussing Ex. 1, pp. 15-16).) While he acknowledges that the vomiting center is in the medulla, Dr. Steinman emphasizes that the pons is adjacent to the medulla and thus near the vomiting center. (*Id.*) Therefore, given the close proximity, he argues that the inflammation from petitioner's lesion in the pons could have extended to the vomiting center thereby leading to a vomiting response. (*Id.* at 60-61, 385.) Additionally, Dr. Steinman notes that a lesion impacting the cerebellum could cause nausea and dizziness. (*Id.* at 61.) Accordingly, he indicates that petitioner's vomiting could be related to his brainstem lesions; however, he testified petitioner's double vision was the more likely cause. (*Id.* at 56-57, 60-61, 156-57, 385.)

Dr. Steinman's theory of causation is based on molecular mimicry, whereby "shared structures on a virus or bacteria or in a vaccine can trigger a cross-reactive response to self." (Ex. 19, p. 13 (citing Lawrence Steinman, 269 *Autoimmune Disease*, SCIENTIFIC AM., Sep. 1993, at 106 (Ex. 29)).) Molecular mimicry is a mechanism that can initiate immunoreactivity leading to autoimmune disease. (*Id.* at 14 (citing Robert S. Fujinami et al., *Molecular Mimicry, Bystander Activation*, *or Viral Persistence: Infections and Autoimmune Disease*, 19 CLINICAL MICROBIOLOGY REVS. 80 (2006) (Ex. 31)).) Dr. Steinman explains that cross reactive immune responses are common, and, therefore, for an autoimmune response to occur, the cross reaction must occur between the virus and a host's disease-related epitope. (*Id.* (citing Fujinami et al., *supra*, at Ex. 31).) An autoimmune response can be triggered by a short stretch of amino acids, with studies demonstrating that the shared identity of five out of 10 or five out of 12 amino acids, not even consecutive amino acids, is the minimum homology sufficient to induce neurologic disease. (*Id.* at 15-18 (citing Anand M. Gautam et al., *A Polyalanine Peptide with Only Five Native Myelin Basic Protein Residues Induces Autoimmune Encephalomyelitis*, 176 J. EXPERIMENTAL MED. 605 (1992) (Ex. 39); Anand M. Gautam et al., *Minimum Structural Requirements for Peptide Presentation by Major Histocompatibility Complex Class II Molecules: Implications in Induction of Autoimmunity*, 91 PROCS. NAT'L ACAD.

SCI. 767 (1994) (Ex. 40); Anand M. Gautam et al., *A Viral Peptide with Limited Homology to a Self Peptide Can Induce Clinical Signs of Experimental Autoimmune Encephalomyelitis*, 161 J. IMMUNOLOGY 60 (1998) (Ex. 41); Robert Root-Bernstein, *Rethinking Molecular Mimicry in Rheumatic Heart Disease and Autoimmune Myocarditis: Laminin, Collagen IV, CAR, and B1AR as Initial Targets of Disease*, 2 FRONTIERS PEDIATRICS, Aug. 2014 (Ex. 42)).)

Oligoclonal bands are immunoglobulin proteins found in the CSF, which indicates inflammation in the central nervous system and is a diagnostic finding consistent with multiple sclerosis. (Ex. 19, p. 19.) A 1981 study by Salmi et al. found evidence of synthesis of oligoclonal antibodies to the diphtheria toxoid in the brains of some individuals with multiple sclerosis, noting that all these individuals had been vaccinated between two to twenty-four years prior to their first clinical manifestations of the disease. (*Id.*; Tr. 103-04 (citing A. Salmi et al., *Intrathecal Synthesis of Antibodies to Diphtheria and Tetanus Toxoids in Multiple Sclerosis Patients*, 1 J. NEUROIMMUNOLOGY 333 (1981) (Ex. 35)).) Dr. Steinman notes that the diphtheria toxoid is the only protein in the Menactra vaccine. (Ex. 19, p. 11; Tr. 101, 104-05 (citing Prescribing Information, Menactra, Meningococcal (Groups A, C, Y and W-135) Polysaccharide Diphtheria Toxoid Conjugate Vaccine: Suspension for Intramuscular Injection [hereinafter Menactra Package Insert] (Ex. 28)).) This is important because to invoke the theory of molecular mimicry as the cause of disease, "there must be something in the vaccine which is also attacked in the disease that's under consideration." (Tr. 105.)

In his first report, Dr. Steinman focuses on how the diphtheria toxoid in the Menactra vaccine cross-reacts with contactin-2, a protein found on myelinated axons that is attacked in multiple sclerosis. (Ex. 19, pp. 12, 18-26.) Contactin-2 is a protein found in the central and peripheral nervous systems. (Tr. 102.) A study by Derfuss et al. first identified contactin-2 as a molecule targeted and involved in the autoimmune attack in multiple sclerosis. (Tr. 101-03 (discussing Tobias Derfuss et al., *Contactin-2/TAG-1-Directed Autoimmunity is Identified in Multiple Sclerosis Patients and Mediates Gray Matter Pathology in Animals*, 106 PROCS. NAT'L ACAD. SCI. 8302 (2009) (Ex. 37)).) The study showed that individuals with multiple sclerosis had an increased T-cell response to contactin-2, and antibody responses to contactin-2 were observed in the serum in the majority of individuals with multiple sclerosis. (Ex. 19, p. 20 (discussing Derfuss et al., *supra*, at Ex. 37).) Accordingly, the authors identified contactin-2 as an autoantigen for both T-cells and antibodies in patients with multiple sclerosis. (Tr. 102-03 (discussing Derfuss et al., *supra*, at Ex. 37).) Additionally, the study investigators used an animal model to demonstrate that autoimmune responses to contactin-2 contributed to the development of gray matter lesions in multiple sclerosis. (Ex. 19, p. 20; Tr. 102 (discussing Derfuss et al., *supra*, at Ex. 37)).) Another study by Boronat et al. found antibodies to contactin-2 in 7.8% of the patients studied with relapsing-remitting multiple sclerosis. (Ex. 19, p. 21 (citing Anna Boronat et al., *Analysis of Antibodies to Surface Epitopes of Contactin-2 in Multiple Sclerosis*, 244 J. NEUROIMMUNOLOGY 103 (2012) (Ex. 38)).)

Dr. Steinman performed a BLAST search to identify mimics between the diphtheria toxin and contactin-2. (Ex. 19, pp. 21-23; Tr. 105-07.) Through his BLAST search, Dr. Steinman identified two potential mimics. (Ex. 19, pp. 24-25.) The contactin-2 sequence VENMAVRPA and the diphtheria toxin sequence VHNSYNRPA, sharing five of nine amino acids, and the contactin-2 sequence FEVKIRSYNR and the diphtheria toxin sequence FQVVHNSYNR, sharing six of 10 amino acids, which Dr. Steinman opines contain the sufficient degree of homology to potentially induce clinically relevant neuroinflammation. (Ex. 19, pp. 24-25; Tr. 107-08 (citing Gautam et al., *supra*, at Ex. 39; Gautam et al., *supra*, at Ex. 40; Gautam et al., *supra*, at Ex. 41).)

Dr. Steinman ran the mimics through the Immune Epitope Database ("IEDB"), which brought him to a peer-reviewed study on the individuals immunized with the diphtheria toxoid. (Ex. 19, pp. 25-26; Tr. 110 (citing Raghavanpillai Raju et al., *Epitopes for Human CD4+ Cells on Diphtheria Toxin: Structural Features of Sequence Segments Forming Epitopes Recognized by Most Subjects*, 25 EUR. J. IMMUNOLOGY 3207 (1995) (Ex. 43)).) The study revealed that humans mount a significant immune response against one of the identified sequences in the diphtheria toxin, FQVVHNSYNR, and that the immune response was of statistical significance. (Ex. 19, pp. 25-26; Tr. 110, 163, 376-79 (citing Raju et al., *supra*, at Ex. 43).) Therefore, Dr. Steinman opines that molecular mimicry between the diphtheria toxoid in the Menactra vaccine and contactin-2, a molecule shown to be targeted in multiple sclerosis, could have caused a significant aggravation of petitioner's relapsing-remitting multiple sclerosis. (Ex. 19, p. 26; Tr. 114.)

Dr. Steinman acknowledges that Raju et al. does not discuss contactin-2, noting that the molecule had not been discovered at the time the article was published. (Tr. 165.) Additionally, Dr. Steinman agrees with Dr. Whitton's critique that Raju et al. looks at T-cells, not antibodies, and acknowledges that this is a limitation of the study. (*Id.* at 379, 383-84 (discussing Raju et al., *supra*, at Ex. 43).) Despite this limitation, Dr. Steinman opines that the findings of Raju et al. are still relevant to this case because the T-cell response is very important in multiple sclerosis and T-cells are necessary to produce antibodies. (*Id.* at 383-84 (discussing Raju et al., *supra*, at Ex. 43).) Therefore, even though Raju et al. does not address the ultimate outcome of the production of antibodies, it addresses an important step in that process. (*Id.* at 384 (discussing Raju et al., *supra*, at Ex. 43).)

In his second report, Dr. Steinman proposes a second theory independent of the contactin-2 theory, which focuses on a new protein called GlialCAM. (Ex. 46; *see also* Tr. 127-28.) Since authoring his first report, new medical literature was published that identified a molecular mimic between EBNA-1, a molecule in EBV, and a protein called GlialCAM that triggers multiple sclerosis. (Ex. 46, pp. 1-3 (citing Tobias V. Lanz et al., *Clonally Expanded B Cells in Multiple Sclerosis Bind EBV EBNA1 and GlialCAM*, 603 NATURE 321 (2022) (Ex. 48); Hartmut Wekerle, *Multiple Sclerosis Sparked by Virus-Led Autoimmunity*, 603 NATURE 230 (2022) (Ex. 47); William H. Robinson & Lawrence Steinman, *Epstein-Barr Virus and Multiple Sclerosis*, 375 SCIENCE 264 (2022) (Ex. 49)).) In Lanz et al., the authors demonstrated high-affinity molecular mimicry between EBNA-1 and GlialCAM. (*Id.* at 1 (citing Lanz et al., *supra*, at Ex. 48).) The authors

> examined antibodies obtained from the cerebrospinal fluid (CSF) of people with MS, and identified antibodies that recognize small regions of protein (antigens) corresponding to proteins of the Epstein-Barr virus. The authors report that such antibodies also recognize the protein GlialCAM, which is a component of glial cells in the brain. This result indicates that GlialCAM can act as a target of these antibodies, providing an 'autoantigen' for self-directed autoimmunity; it also suggests that this contributes to the events leading to MS.

(*Id.* at 3 (quoting Wekerle, *supra*, at Ex. 47, p. 1 (discussing the Lanz et al. study)).) Comparing EBNA-1 and GlialCAM, Lanz et al. identified a stretch of 12 amino acids, of which five were identical, and a stretch of 11 amino acids, of which six were identical. (*Id.* at 2 (citing Lanz et al., *supra*, at Ex. 48, p. 5, fig. 3g); Tr. 115, 117.) Dr. Steinman explains that even "this degree of mimicry provides 'a mechanistic link for the association between [multiple sclerosis] and [the Epstein-Barr virus].'" (Ex. 46, p. 2 (quoting Lanz et al., *supra*, at Ex. 48, p. 1).) When tested in an experimental autoimmune encephalomyelitis ("EAE") model, the EBNA-1 epitope worsened disease. (*Id.* at 2 (citing Lanz et al., *supra*, at Ex. 48); Tr. 166.)

Dr. Steinman emphasizes that this case is not about EBV; however, he notes that this case does involve significant aggravation of multiple sclerosis, and multiple sclerosis is triggered by EBV according to epidemiological evidence. (Tr. 117.) To determine if there was a link between GlialCAM, "the molecule attacked in triggering [multiple sclerosis]," and contactin-2, Dr. Steinman ran a BLAST search comparing the two molecules. (Ex. 46, pp. 4-7; Tr. 118.) He stresses that the result of his BLAST search was "astonishing," demonstrating that over 117 amino acids, GlialCAM and contactin-2 share 31 identical amino acids. (Tr. 118; Ex. 46, p. 5.) Additionally, the expect values (E-values) are indicative of a strong relationship between the two molecules. (Ex. 46, p. 7; Tr. 118.) Accordingly, Dr. Steinman opines that the BLAST search results reveal that GlialCAM and contactin-2 are "exceptionally close relatives over much longer stretches than 6 to 20 amino acids." (Ex. 46, p. 7; Tr. 92, 119.)

Dr. Steinman also performed a BLAST search between GlialCAM and the diphtheria toxin, which revealed that the two molecules are "highly related over large stretches." (Ex. 46, pp. 7-10.) He indicates that this BLAST search identified a potentially meaningful mimic, the GlialCAM sequence HSSPPRAPSSPGR and the diphtheria toxin sequence HNSYNRPAYSPGH sharing six out of 12 identical amino acids. (*Id.* at 10, 13.) Dr. Steinman highlights that the diphtheria toxin sequence HNSYNRPAYSPGH is the same sequence identified as a critical molecular mimic with contactin-2 in his initial report. (*Id.* at 10-13; Tr. 120, 125.) Dr. Steinman also notes that the sequence HSSPPRAPSSPGR is in the "region of the GlialCAM . . . involved in triggering [multiple sclerosis]," which demonstrates that the Menactra vaccine with the diphtheria toxin contains a six out of 12 amino acid identity with GlialCAM in a region found to be responsible for causing multiple sclerosis. (Ex. 46, p. 13 (citing Wekerle, *supra*, at Ex. 47; Lanz et al., *supra*, at Ex. 48; Robinson & Steinman, *supra*, at Ex. 49).)

Thus, Lanz et al. satisfies the third step of Dr. Steinman's filtration process with respect to GlialCAM. (Tr. 126.)

In sum, Dr. Steinman concludes that two antigens, contactin-2 and GlialCAM, share sufficient homology with the diphtheria toxin to trigger a neuroinflammatory event. (Tr. 126.) Dr. Steinman confirmed that his contactin-2 and GlialCAM theories are independent from one another and can stand on their own. (*Id.* at 127-28.) However, he clarified that even though they represent different possible molecular mimics, they could theoretically both be operational in that they can respond to different regions of the diphtheria toxoid. (*Id.* at 128.) Given that petitioner's treating providers ruled out a viral infection, Dr. Steinman opines that molecular mimicry between the diphtheria toxoid in the vaccine and contactin-2 and GlialCAM is the more likely explanation for petitioner's significant aggravation of his pre-existing relapsing-remitting multiple sclerosis. (*Id.* at 126-27, 138.)

With respect to epidemiology, Dr. Steinman states that epidemiological studies can "certainly miss rare events." (Tr. 134-35.) During his testimony, Dr. Steinman discussed Langer-Gould et al., a study filed by one of respondent's experts in support of his argument that there is a lack of epidemiological evidence showing any association between vaccines and the onset, relapse, or exacerbation of multiple sclerosis. (*Id.* at 135-38 (discussing Annette Langer-Gould et al., *Vaccines and the Risk of Multiple Sclerosis and Other Central Nervous System Demyelinating Diseases*, 71 JAMA NEUROLOGY 1506 (2014) (Ex. A, Tab 15)).) Upon questioning, Dr. Steinman agreed that Langer-Gould's conclusion that their "findings are consistent with vaccines acting as a proinflammatory co-factor in individuals with subclinical autoimmunity because the mechanism would be expected to hasten symptom onset, but not change the long-term risk of developing [multiple sclerosis] or clinically isolated syndrome" supports the biological plausibility of the causal theory he has offered in this case. (*Id.* at 137 (discussing Langer-Gould et al., *supra*, at Ex. A, Tab 15).)

Dr. Steinman defends his use of BLAST searches and the small identified sequences of amino acids in his mimics by explaining that "the adaptive immune system recognizes 'chunks of proteins,' called epitopes of approximately 6-20 amino acids." (Ex. 46, p. 7; Tr. 132-33; *see also* Tr. 167-72.) Again, he stresses that the BLAST search is just one step in the process and that other steps of filtration are applied to obtain more stringent results. (Tr. 106, 131-33, 162-63.) In response to Dr. Whitton's argument that the Silvanovich et al. studies undermine his reliance on BLAST for identification of a potential molecular mimic, Dr. Steinman testified that he puts low value in the Silvanovich criteria, stressing that those studies focused on engineered food and food allergies, which is not the focus of this case. (*Id.* at 132-33, 372, 374, 388 (discussing Andre Silvanovich et al., *The Value of Short Amino Acid Sequence Matches for Prediction or Protein Allergenicity*, 90 TOXICOLOGICAL SCIS. 252 (2006) (Ex. C, Tab 15); Andre Silvanovich et al., *The Use of* E-*Scores to Determine the Quality of Protein Alignments*, 54 REGULATORY TOXICOLOGY & PHARMACOLOGY S26 (2009) (Ex. C, Tab 16)).) He emphasizes that T-cells and antibodies both often recognize a small stretch of a protein, not 80 amino acids. (*Id.* at 121.) Therefore, the Silvanovich criteria

that requires the length of a homology to be at least 80 amino acids long is not representative of how the immune system works. (*Id.* at 372.) Accordingly, Dr. Steinman contends that Silvanovich et al. fails to address the small chunks of protein in an immunological epitope and is of limited relevance to this analysis. (Ex. 46, pp. 14-15; Tr. 372, 374.) Thus, it follows that the E-values identified by Silvanovich et al. are irrelevant to how the adaptive immune system processes antigens. (Ex. 46, p. 17.) Moreover, he stresses that Lanz et al. demonstrated molecular mimicry between EBNA-1 and GlialCAM with a shared identity of five out of 12 amino acids, which further illustrates that the Silvanovich criteria are irrelevant. (Tr. 373-74.)

With regard to timing, Dr. Steinman testified that the onset of petitioner's significant aggravation of his pre-existing relapsing-remitting multiple sclerosis occurred approximately 14 days post-vaccination, noting that petitioner first experienced symptoms on or around January 25, 2018.[5] (Tr. 59, 114-15, 141.) He maintains the two-week timeframe in this case is consistent with the timing he would expect for an adaptive immune response triggering an autoimmune condition. (Ex. 19, p. 27; Tr. 143.) Thus, Dr. Steinman opines that a 14-day onset is within the medically acceptable timeframe to infer vaccine causation. (Ex. 19, p. 27; Tr. 141-44.)

Dr. Steinman argues that the medical literature supports his conclusion that a two-week onset is a medically acceptable timeframe in this case. (Ex. 19, p. 27; Tr. 141-44.) He contends that an interval of 14 days between the vaccination and the onset of petitioner's significant aggravation fits within the acceptable timeframe reported by Schonberger et al., an epidemiologic study that determined the risk period for developing GBS after receipt of the 1976 swine flu vaccine was 42 days. (Ex. 19, p. 27; Tr. 142-43 (citing Lawrence B. Schonberger et al., *Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976-1977*, 110 AM. J. EPIDEMIOLOGY 105 (1979) (Ex. 45)).) In a prior case where the petitioner was granted entitlement for multiple sclerosis caused-in-fact by the Menactra vaccine, Dr. Steinman relied on Schonberger et al. in opining that 42 days is a medically appropriate timeframe for a person to develop an autoimmune reaction. (Ex. 19, pp. 11-12, 27 (discussing *Giannetta v. Sec'y of Health & Human Servs.*, No. 13-215V, 2017 WL 4249946 (Fed. Cl. Spec. Mstr. Sep. 1, 2017)).) Dr. Steinman testified that the analysis of the appropriateness of the timing of the immune response is the same for both causation-in-fact and significant aggravation cases. (Tr. 143.)

Additionally, Dr. Steinman cites a study that analyzed the onset of acute disseminated encephalomyelitis following vaccination. (Ex. 19, p. 27 (citing L. Bennetto & N. Scolding, *Inflammatory/Post-Infectious Encephalomyelitis*, 75 J. NEUROLOGY

[5] In his initial expert report, Dr. Steinman stated that petitioner experienced a significant aggravation of his relapsing-remitting multiple sclerosis 19 days post-vaccination. (Ex. 19, pp. 2, 11, 26-27.) However, during his testimony at the entitlement hearing, Dr. Steinman clarified that the onset of petitioner's relapse occurred 14 days, not 19 days, after receipt of the Menactra vaccine. (Tr. 114-15.) He explained that in his initial expert report, he used the record for the January 30, 2018 emergency room encounter to calculate onset but forgot to account for the fact that petitioner reported his symptoms had been ongoing for five days at that point. (*Id.* at 114-15, 141.)

NEUROSURGERY PSYCHIATRY 22 (2004) (Ex. 44)).) Although Dr. Steinman acknowledges that the meningococcal vaccine is not listed in this article, he notes that the diphtheria vaccine is one of the listed vaccines associated with acute disseminated encephalomyelitis. (*Id.* (citing Bennetto & Scolding, *supra*, at Ex. 44, p. 2, tbl. 1).) This article reported that onset varies; however, in the context of non-neural vaccines, onset most commonly occurred within a 1-14 day timeframe. (*Id.* (citing Bennetto & Scolding, *supra*, at Ex. 44, p. 3).) While Dr. Steinman acknowledges that the papers by Schonberger et al. and Bennetto & Scolding are not exactly on point with respect to the specific vaccine and injury at issue, he contends that the articles support the two-week onset in this case. (Tr. 141-43.)

**b. Gregory L. Holmes, M.D.[6]**

Dr. Holmes submitted three expert reports and testified in this case. (Exs. A, F, G; Tr. 174.) Dr. Holmes was proffered as an expert in neurology and pediatric neurology without objection. (Tr. 177.) He concurs that relapsing-remitting multiple sclerosis is more likely than not the correct diagnosis in this case. (Ex. A, p. 9; Tr. 178-79.) Dr. Holmes also agrees with Dr. Steinman's opinion that petitioner's relapsing-remitting multiple sclerosis began prior to his receipt of the Menactra vaccine at issue. (Ex. A, pp. 11-13; Tr. 190-91.) However, he disagrees that the vaccine at issue caused or significantly aggravated petitioner's multiple sclerosis. (Ex. A, p. 12-13; Tr. 179, 196.) Furthermore, Dr. Holmes opines that petitioner's relapse was caused by a viral illness. (Tr. 213; Ex. F, pp. 2-3.)

Dr. Holmes explains that multiple sclerosis "is characterized by recurrent episodes of demyelination in the central nervous system (CNS) separated in space and time." (Ex. A, p. 9; *see also* Tr. 179-80.) It is an "inflammatory disorder of the brain and spinal cord in which focal lymphocytic infiltration leads to damage of myelin and axons." (Ex. A, p. 9 (citing Alastair Compston & Alasdair Coles, *Multiple Sclerosis*, 372 LANCET 1502 (2008) (Ex. A, Tab 6); Calliope A. Dendrou et al., *Immunopathology of Multiple Sclerosis*, 15 NATURE REVS. 545 (2015) (Ex. A, Tab 7)).) Initially, remyelination occurs and patients recover from episodes of neurological dysfunction; however, eventually,

---

[6] Dr. Gregory L. Holmes received his medical degree at the University of Virginia School of Medicine in 1974. (Ex. B, p. 1.) He completed an internship and residency in pediatrics at Yale University School of Medicine. (*Id.*) Thereafter, he completed a second residency in pediatric neurology at the University of Virginia School of Medicine. (*Id.*) Dr. Holmes has held professorships at various institutions, including the University of Connecticut Health Center, Medical College of Georgia, Harvard Medical School, and Dartmouth Medical School. (*Id.* at 2.) Currently, he serves as a Professor of Pediatrics and Neurological Sciences and is the Chair of the Department of Neurological Sciences at the Larner College of Medicine at the University of Vermont. (*Id.* at 1-2; Tr. 175.) Additionally, he is a physician leader for the Neurology Healthcare Service at the University of Vermont Medical Center. (Ex. B, pp. 1-2.) In these roles, he evaluates and treats children with neurological disorders, including multiple sclerosis. (Ex. A, p. 1; Tr. 176.) Dr. Holmes is board certified in pediatrics, psychiatry and neurology with a special competence in child neurology, and neurophysiology. (Ex. B, p. 2; Ex. A, p. 1.) He maintains his license to practice medicine in Vermont, New York, and New Jersey. (Ex. H, p. 2; Tr. 175.) Dr. Holmes has authored over 300 peer reviewed publications, over 100 review articles, 79 books and chapters, and over 400 abstracts. (Ex. H, pp. 34-78, 84-114.)

"the pathological changes become dominated by widespread microglial activation associated with extensive and chronic neurodegeneration." (*Id.*; *see also* Tr. 180.)

Dr. Holmes explains that the cause of multiple sclerosis is currently unknown. (Ex. A, p. 10 (citing D.S. Goodin, *The Epidemiology of Multiple Sclerosis: Insights to a Causal Cascade*, *in* HANDBOOK CLINICAL NEUROLOGY 173 (vol. 138, 2016) (Ex. A, Tab 8); Alyssa Nylander & David A. Hafler, *Multiple Sclerosis*, 122 J. CLINICAL INVESTIGATION 1180 (2012) (Ex. A, Tab 9)); *see also* Tr. 197-98.) He testified that there are a lot of different factors that could be related to the onset of multiple sclerosis, emphasizing the complexity of potential risk factors. (Tr. 197-200.) However, Dr. Holmes acknowledges that "[t]he most widely accepted theory is that [multiple sclerosis] begins as an inflammatory immune-mediated disorder characterized by an autoimmune response to self-antigens in a genetically susceptible individual." (Ex. A, p. 10 (citing Nylander & Hafler, *supra*, at Ex. A, Tab 9).)

Multiple sclerosis is very rare in the pediatric population. (Ex. A, p. 9 (citing Anna Jeong et al., *Epidemiology of Pediatric-Onset Multiple Sclerosis: A Systematic Review of the Literature*, 34 J. CHILD NEUROLOGY 705 (2019) (Ex. A, Tab 5)); Tr. 180.) The initial clinical presentation of pediatric-onset multiple sclerosis can look like ADEM. (Tr. 181.) In the vast majority of pediatric-onset cases, relapsing-remitting multiple sclerosis is the course of disease observed. (Ex. A, p. 9 (citing Ex. A, p. 9 (citing A. Boiko et al., *Early Onset Multiple Sclerosis: A Longitudinal Study*, 59 NEUROLOGY 1006 (2002) (Ex. A, Tab 1); Brenda Banwell et al., *Clinical Features and Viral Serologies in Children with Multiple Sclerosis: A Multinational Observational Study*, 6 LANCET NEUROLOGY 773 (2007) (Ex. A, Tab 2); Christel Renoux et al., *The Natural History of Multiple Sclerosis with Childhood Onset*, 110 CLINICAL NEUROLOGY & NEUROSURGERY 897 (2008) (Ex. A, Tab 3); I.L. Simone et al., *Course and Prognosis in Early-Onset Multiple Sclerosis: Comparison with Adult-Onset Forms*, 59 NEUROLOGY 1922 (2002) (Ex. A, Tab 4)); Tr. 181-82.) Relapsing-remitting multiple sclerosis involves "clearly defined attacks of new or increasing neurologic symptoms" (relapses), "followed by periods of partial or complete recovery (remissions)." (Ex. A, p. 12; Tr. 181.) During remissions, a patient's symptoms may disappear completely, or some symptoms may continue and become permanent. (Ex. A, p. 12.) Relapses are more frequent in pediatric-onset cases, suggesting that pediatric patients experience a more inflammatory disease course than compared to patients with adult-onset multiple sclerosis. (*Id.*; Tr. 181, 184.)

Based on his review of the medical records and the testimony offered by petitioner's mother, Dr. Holmes opines that petitioner likely experienced his first attack of multiple sclerosis in December of 2017. (Ex. A, p. 9; Tr. 190, 194-95.) He notes that around December of 2017, documentation in the medical records indicate that petitioner started to exhibit balance issues and a change in his gait, including toe walking, swaying of his right leg, and a "bouncy" walk. (Ex. A, p. 9; Tr. 190, 194.) Although petitioner did not receive a definitive diagnosis until 2018, Dr. Holmes attributes these symptoms to petitioner's multiple sclerosis. (Ex. A, p. 9.) While he explains that petitioner's onset of episodes of daytime urinary incontinence in 2016 may have been

caused by his multiple sclerosis (*Id.*), Dr. Holmes states that petitioner's longstanding history of nighttime urinary incontinence was likely unrelated to his condition (Tr. 190).

Dr. Holmes opines that petitioner's onset of new neurological symptoms on January 25, 2018, including his complaints of numbness, tingling, and weakness on the right side, constitutes a relapse of his multiple sclerosis. (Ex. A, pp. 9, 12; Tr. 191, 195.) He explains that petitioner's gait and balance changes in December of 2017 are characterized as motor findings localized to the corticospinal tract, whereas his neurological symptoms in late January of 2018 were predominantly sensory findings. (Tr. 194-95.) Therefore, Dr. Holmes stresses that these findings are indicative of different lesions separated in space and in time. (*Id.*) Accordingly, Dr. Holmes contends that petitioner's symptoms in January of 2018 represent a relapse of his multiple sclerosis, rather than a significant aggravation of a pre-existing lesion. (Ex. A, p. 12.) Moreover, Dr. Holmes maintains that petitioner's multiple sclerosis followed the expected course. (Tr. 179, 240-41.) He testified that "we pretty much know what the course is going to be with relapsing-remitting [multiple sclerosis]. People will relapse." (*Id.* at 240.) Further, he testified that this is the type of relapse he would expect to see in a case of pediatric-onset relapsing-remitting multiple sclerosis. (*Id.* at 195.)

Dr. Holmes noted that it has been hypothesized that a stimulus of the immune system, such as a vaccination, may trigger multiple sclerosis. (Ex. A, p. 10.) However, he explains that, despite this theory, "many studies have failed to show any association between vaccines and onset, relapse or exacerbation of [multiple sclerosis]." (Ex. A, p. 10 (citing Alberto Ascherio et al., *Hepatitis B Vaccination and the Risk of Multiple Sclerosis*, 344 NEJM 327 (2001) (Ex. A, Tab 10) (case-control study finding no association between the hepatitis B vaccination and multiple sclerosis); Christian Confavreux et al., *Vaccinations and the Risk of Relapse in Multiple Sclerosis*, 344 NEJM 319 (2001) (Ex. A, Tab 11; *see also* Ex. C, Tab 1) (case-crossover study assessing "whether vaccinations increase the risk of relapse in multiple sclerosis" and finding that vaccinations, including hepatitis B, tetanus, flu, hepatitis A, typhoid, yellow fever, poliovirus, and diphtheria, had no association with multiple sclerosis); Miguel A. Hernán et al., *Tetanus Vaccination and Risk of Multiple Sclerosis: A Systemic Review*, 67 NEUROLOGY 212 (2006) (Ex. A, Tab 12) (systematic review of nine case-control studies that concluded that the tetanus vaccination decreased the risk of multiple sclerosis); Olivier T. Rutschmann et al., *Immunization and MS: A Summary of Published Evidence and Recommendations*, 59 NEUROLOGY 1837 (2002) (Ex. A, Tab 13) (literature review finding no evidence that the hepatitis B, varicella, tetanus, or Bacille Calmette-Guerin vaccines increase the risk of multiple sclerosis exacerbations); Frank DeStefano et al., *Vaccinations and Risk of Central Nervous System Demyelinating Diseases in Adults*, 60 ARCHIVES NEUROLOGY 504 (2003) (Ex. A, Tab 14; *see also* Ex. C, Tab 2) (case-control study of adults finding no association between hepatitis B, influenza, tetanus, measles, or rubella vaccination and multiple sclerosis); Langer-Gould et al., *supra*, at Ex. A, Tab 15); Tr. 201-12.)

Specifically, Dr. Holmes emphasizes that "there is no evidence that the meningococcal vaccination causes or exacerbates [multiple sclerosis]." (Ex. A, p. 10;

Tr. 201.) To support his opinion, Dr. Holmes cites an observational, retrospective study that specifically assessed the safety of the Menactra vaccine. (Ex. A, p. 10 (citing J. Hansen et al., *Post-Licensure Safety Surveillance Study of Routine Use of Quadrivalent Meningococcal Diphtheria Toxoid Conjugate Vaccine*, 35 VACCINE 6879 (2017) (Ex. A, Tab 16; *see also* Ex. C, Tab 3)).) The study did not detect any safety concerns following the vaccine. (*Id.*; Tr. 201-02 (discussing Hansen et al., *supra*, at Ex. A, Tab 16).) Therefore, he stresses that there is no epidemiological evidence to support petitioner's argument that the Menactra vaccination, or any vaccination for that matter, can cause a multiple sclerosis relapse. (Tr. 196, 221-22.) When asked whether he requires epidemiological support to conclude that a vaccination is capable of causing or exacerbating an autoimmune condition, Dr. Holmes disagreed (*Id.* at 227-28); however, he stresses that he views epidemiologic studies as important in formulating his opinion in this case (*Id.* at 252). Additionally, Dr. Holmes acknowledges that it is possible that a rare adverse event would not be detected by an epidemiological study. (*Id.* at 228.)

Dr. Holmes stresses that petitioner was diagnosed with a viral infection four days prior to being admitted to the hospital. (Ex. A, p. 13 (citing Ex. 6, pp. 6-7).) He opines that petitioner did have a virus, emphasizing petitioner's reported history of vomiting and loose stool as evidence of the viral infection. (Tr. 195-96, 213-15, 228-30 (discussing Ex. 6, p. 6).) During the hearing, Dr. Holmes acknowledged that the record for petitioner's pediatrician encounter on January 27, 2018, includes documentation indicating that petitioner denied experiencing diarrhea; however, he states that a report of loose stools and an absence of diarrhea are not necessarily inconsistent with one another. (*Id.* at 229-30 (discussing Ex. 6, p. 6; Ex. 7, p. 318).) Accordingly, Dr. Holmes states that he agrees with Dr. Salom's diagnosis of gastroenteritis. (*Id.* at 256.)

While Dr. Holmes agrees that vomiting can be a symptom of multiple sclerosis, he contends it is typically only observed in pediatric cases where the child experiences an acute onset with a clinical presentation similar to ADEM with encephalopathy. (Tr. 233; *see also id.* at 181.) He notes that these children often experience seizures and headaches as well. (*Id.* at 181, 233.) Dr. Holmes acknowledges that petitioner's treating providers initially suspected he was suffering from ADEM. (Ex. A, p. 13; Tr. 233.) He stresses that encephalopathy is not implicated in this case, and that there is no evidence indicating petitioner was experiencing a headache with his episode of vomiting. (Tr. 182, 233.) Therefore, Dr. Holmes concludes that petitioner's multiple sclerosis did not cause his vomiting. (*Id.* at 181-82, 233.) When asked whether he thought the strong initial suspicion for ADEM influenced petitioner's treating providers' decision-making in viewing petitioner's prodrome as viral, Dr. Holmes responded that he has no way of knowing what they were thinking at that time. (*Id.* at 260.) However, he recognized that it is very common for a viral illness to precede ADEM, noting that eliciting a history of a viral illness makes treating providers more comfortable with making the diagnosis of ADEM. (*Id.* at 260-61.)

In response to Dr. Steinman's argument that petitioner's vomiting can be explained by his multiple sclerosis via his double vision or brainstem lesions, Dr. Holmes testified that he strongly disagreed. (Tr. 215-18, 262-63.) Dr. Holmes casts

doubt on the idea that petitioner's double vision caused his vomiting, emphasizing that "I see people with diplopia all the time and they're not vomiting." (*Id.* at 216-17.) He also questions whether petitioner's double vision was even related to his multiple sclerosis, noting that he would not expect a lesion in the pons to lead to diplopia. (*Id.* at 215-17, 263.) Additionally, he stresses that petitioner's brainstem lesions involved the middle cerebral peduncle and the pons, not the medulla, which is where the area postrema (the vomiting center) is located. (*Id.* at 215, 262-63.) Therefore, given the anatomy of petitioner's lesions, Dr. Holmes contends it is highly unlikely that the lesions would have activated a vomiting response. (*Id.* at 216, 262-63.) However, upon questioning from the undersigned, Dr. Holmes conceded that only a millimeters-wide distance separates the vomiting center from petitioner's lesion in the pons. (*Id.* at 263.) Although, he noted that some individuals with multiple sclerosis can experience swelling around a lesion that compresses other areas of the brain thereby having an effect beyond just where the lesion is physically located, Dr. Holmes states that the radiologist did not make any comments or findings regarding any kind of displacement of the brainstem in this case. (*Id.*)

Dr. Holmes maintains that there is evidence showing that viral infections have been associated with worsening or relapse of multiple sclerosis, whereas there is no evidence suggesting that vaccines can cause such exacerbations. (Ex. G, p. 1 (citing Patricia K. Coyle et al., *Vaccine Considerations for Multiple Sclerosis in the COVID-19 Era*, 38 ADVANCES THERAPY 3550 (2021) (Ex. G, Tab 2); D. Buljevac et al., *Prospective Study on the Relationship Between Infections and Multiple Sclerosis Exacerbations*, 125 BRAIN 952 (2002) (Ex. G, Tab 3)); Tr. 196.) Therefore, Dr. Holmes opines that petitioner's illness was the more likely trigger of his relapse. (Ex. G, p. 1; Tr. 213.)

To support his argument that a virus is the most likely cause of petitioner's relapse, Dr. Holmes relied on Buljevac et al. (Tr. 217-18 (discussing Buljevac et al., *supra*, at Ex. G, Tab 3).) He explains that Buljevac et al. is a longitudinal study that followed 73 patients with relapsing-remitting multiple sclerosis to assess the relationship between infections and relapses. (*Id.* at 217.) The study revealed that infections increased the risk of relapse during the at-risk period, which was defined as two weeks before to five weeks after the onset of the infection. (*Id.* at 217-18.) Given that the authors identified a risk period that precedes the onset of symptoms of infection, Dr. Holmes agrees that it is theoretically possible for an individual to have a relapse associated with infection without any outward clinical evidence or manifestation of infection. (*Id.* at 224.) Dr. Holmes notes that the majority of the infections preceded the neurological deterioration. (*Id.* at 218.) Based on the results of the study, the authors favored an interpretation that the increased disease activity associated with infections is related to components of an inflammatory process that occurs independently of blood brain barrier dysfunction. (*Id.* at 225-26.)

While Dr. Holmes acknowledges that petitioner's testing did not detect a specific pathogen, he testified that the authors in Buljevac et al. stated that the nature of the infectious disease associated with increased disease activity had not been identified in any of the studies. (Tr. 218.) Moreover, he stresses that petitioner did not undergo

testing for a viral illness until January 30, 2018, which was five days after the onset of his possible viral symptoms, such as vomiting. (*Id.* at 219.) When asked if there is anything he would look for clinically, apart from the evidence of the actual infection itself, before attributing a multiple sclerosis relapse with an infection, Dr. Holmes responded no. (*Id.* at 223.)

Dr. Holmes disagrees with petitioner's assertion that Langer-Gould et al. supports causation in this case. (Tr. 206.) He explains that Langer-Gould et al. was a nested case control study that found no evidence that multiple sclerosis or other demyelinating disorders were associated with vaccines. (*Id.* at 206-07 (discussing Langer-Gould et al., *supra*, at Ex. A, Tab 15).) Dr. Holmes acknowledges that the study detected a short-term increased risk of CNS acute demyelinating syndrome 30 days after vaccination in individuals under the age of 50, which the authors indicated may suggest that vaccines may accelerate the transition from subclinical to avert autoimmunity in patients with existing disease. (*Id.* at 207-08 (discussing Langer-Gould et al., *supra*, at Ex. A, Tab 15).) He emphasizes that the short-term increased risk specific to multiple sclerosis did not reach statistical significance; however, he conceded that the finding of a short-term increased risk did reach statistical significance when all the different types of injuries were considered. (*Id.* at 208-11 (discussing Langer-Gould et al., *supra*, at Ex. A, Tab 15).) Therefore, Dr. Holmes suggests that the authors base this finding of a short-term increased risk relative to multiple sclerosis on nonstatistical data. (*Id.* at 211 (discussing Langer-Gould et al., *supra*, at Ex. A, Tab 15).) Upon questioning from the undersigned, Dr. Holmes agreed that Buljevac et al. and Langer-Gould et al. have the same basic hypothesis, which is that a subclinical inflammatory insult can lead to a relapse in patients with multiple sclerosis. (*Id.* at 226.)

Regarding Dr. Steinman's proposed theory of causation, Dr. Holmes opines that it seems highly unlikely. (Ex. A, p. 13.) He explains that Dr. Steinman argues that petitioner developed new antibodies against contactin-2 via molecular mimicry with the diphtheria toxoid in the vaccine, which resulted in an aggravation of petitioner's pre-existing multiple sclerosis. (*Id.*) However, Dr. Holmes questions why it would take a new antigen from the diphtheria toxoid to induce a relapse when there was already an autoimmune response to self-antigens at the time of petitioner's initial insult in December of 2017. (*Id.*) Thus, he concludes that Dr. Steinman's theory requires two separate disease-inducing antigens, which Dr. Holmes contends is extremely unlikely. (*Id.*)

Dr. Holmes acknowledges that Lanz et al. demonstrated that multiple sclerosis can be caused by antibodies to GlialCAM/contactin-2 and clearly broadens the clinical phenotype of GlialCAM/contactin-2 autoimmune disease. (Ex. G, p. 3; Tr. 245.) However, he opines that this paper along with the article by Robinson & Steinman are of little relevance to this case. (Ex. F, pp. 1-2.) Petitioner's medical records do "not support an immune response to GlialCAM as either the initial 'trigger' for the onset of [multiple sclerosis] or meningococcal vaccine as the 'trigger' for the relapse." (*Id.* at 2.) He stresses that there is no evidence indicating that petitioner had mononucleosis or

other signs of EBV prior to the onset of his multiple sclerosis; however, he condes that EBV infections can be asymptomatic. (*Id.*)

In particular, Dr. Holmes contends that extrapolating the findings from Lanz et al. to the idea that the Menactra vaccination can cause a relapse is problematic. (Ex. F, p. 2.) While he admits that Lanz et al. presented a convincing mechanism linking the EBV with multiple sclerosis, no such link between the Menactra vaccine and multiple sclerosis has been demonstrated. (Ex. G, pp. 1-2.) He reemphasizes that the Hansen et al. study detected no safety concerns following administration of the Menactra vaccine. (*Id.* at 2 (discussing Hansen et al., *supra*, at Ex. A, Tab 16).) Importantly, Dr. Holmes states that "[c]onsidering most individuals were likely seropositive for EBV, it is remarkable that the meningococcal vaccine had no association with [multiple sclerosis]." (*Id.* (discussing Hansen et al., *supra*, at Ex. A, Tab 16).)

Moreover, Dr. Holmes disputes the idea that because EBV infection can cause multiple sclerosis via molecular mimicry that a meningococcal vaccine will elicit the same pathological process. (Ex. G, p. 2.) Once an individual is infected with EBV, the infection is never cleared, and the virus remains present in a subset of B cells. (*Id.* (citing Samantha S. Soldan & Paul M. Lieberman, *Epstein-Barr Virus and Multiple Sclerosis*, NATURE REVS. MICROBIOLOGY, Aug. 5, 2022 (Ex. G, Tab 7); Gunnar Houen et al., *Epstein-Barr Virus and Multiple Sclerosis*, 11 FRONTIERS IMMUNOLOGY, Dec. 2020 (Ex. G, Tab 8)).) Therefore, according to Dr. Holmes, "[d]evelopment of [multiple sclerosis] after EBV infection requires a viral infection that is lifelong, immortalizes antibody producing B cells, and leads to migration to the central nervous system where they propagate for years before onset of symptoms." (*Id.*) Based on the components of the Menactra vaccine, "there is no evidence that such minute amounts of protein could be distributed to the brain," and there is no medical record evidence that petitioner had a systemic reaction that would "result in the invasion of the brain by antibodies against GlialCAM/con[t]actin-2." (*Id.*)

Further, Dr. Holmes notes that if petitioner "had an aggravation of his disease due to meningococcal vaccine causing an immune response to contactin-2 and GlialCAM, it would be expected that the initial lesions would have been exacerbated," similar to what occurred in the Lanz et al. article; however, Dr. Holmes opines that petitioner "had a relapse, not aggravation, with symptoms, signs and neuroimaging findings demonstrating new lesions." (Ex. F, p. 3 (citing Lanz et al., *supra*, at Ex. 48).) He argues that because Dr. Steinman believes the presenting antigen was the same in the onset and relapse of petitioner's multiple sclerosis, it is surprising that petitioner's lesion distribution differed so dramatically between onset and relapse. (*Id.*)

With regard to timing, Dr. Holmes notes that petitioner had symptoms of a viral illness five days before his relapse. (Ex. G, p. 2.) On the other hand, petitioner's

vaccination occurred 18 days[7] before his relapse.[8] (*Id.*) Therefore, according to Dr. Holmes, it is more likely that the viral illness was the cause of petitioner's relapse. (*Id.*) Further, "if [petitioner's multiple sclerosis] was caused by EBV and primed with antibodies against GlialCAM/contactin-2," Dr. Holmes questions why petitioner's first meningococcal vaccine caused no reaction, while his second meningococcal vaccination took 18 days to cause a relapse. (*Id.*)

**c. J. Lindsay Whitton, M.D., Ph.D.[9]**

Dr. Lindsay Whitton submitted two expert reports and testified in this case. (Exs. C, E; Tr. 266.) Dr. Whitton was proffered as an expert in immunology without objection. (Tr. 274.) Dr. Whitton opines that Dr. Steinman has failed to offer a sound and reliable medical theory to explain how the Menactra vaccination can significantly aggravate pre-existing multiple sclerosis. (Ex. C, p. 23; Ex. E, p. 13; Tr. 339-40.)

Dr. Whitton explains that there is no evidence that vaccinations can cause or exacerbate multiple sclerosis. (Ex. C, pp. 4-5; Tr. 276.) To the contrary, Dr. Whitton cites several studies that found "no increased risk of [multiple sclerosis] development / relapse following the administration of various vaccines, including Menactra." (Ex. C, pp. 4-5 (citing Confavreux et al., *supra*, at Ex. C, Tab 1; DeStefano et al., *supra*, at Ex. C, Tab 2; J. Hansen et al., *supra*, at Ex. C, Tab 3 (observational, retrospective study finding no safety concerns following Menactra vaccination); J. Hansen et al., *Post-Licensure Safety Surveillance Study of Routine Use of Quadrivalent Meningococcal Diphtheria Toxoid Conjugate Vaccine (MenACWY-D) in Infants and Children*, 36 VACCINE 2133 (2018) (Ex. C, Tab 4) (observational, retrospective studies of children aged 9-23 months old and 2-10 years old who received the Menactra, finding the

---

[7] In his timeline of petitioner's symptoms, Dr. Holmes erroneously indicates that petitioner received his vaccination on January 12, 2018. (Ex. A, p. 9; Ex. G, p. 3.) Petitioner received the Menactra vaccination at issue in this case on January 11, 2018. (*See* Ex. 7, p. 39.) Therefore, according to Dr. Holmes, this would place onset of petitioner's relapse at 19 days post-vaccination.

[8] In his final report, Dr. Holmes appears to opine that petitioner's neurological symptoms, notably his right-sided numbness, tingling, and weakness did not begin until January 30, 2018. (Ex. G, pp. 2-3.) This corrected timeline no longer includes petitioner's reported five-day history of numbness and tingling in his right arm that began on January 25, 2018. (*Compare* Ex. A, p. 9, *with* Ex. G, p. 3.) Dr. Holmes does not explain why he no longer accounts for petitioner's complaint of a five-day history of right-sided numbness, tingling, and weakness, which was documented in the record for the January 30, 2018 emergency department encounter, in determining the onset of petitioner's relapse.

[9] Dr. J. Lindsay Whitton received his bachelor's degree, medical degree, and Ph.D. in Herpesvirus transcription from the University of Glasgow in Glasgow, Scotland. (Ex. D, p. 1; Ex. C, p. 1.) From there, Dr. Whitton accepted a postdoctoral fellowship at Scripps Research Institute, where he studied viral pathogenesis, as well as the immune response to viral infections and vaccinations. (Ex. D, p. 1; Ex. C, p. 1.) He was eventually elevated to full professor in the Department of Immunology and Microbiology at the Scripps Research Institute. (Ex. D, p. 1; Ex. C, pp. 1-2.) In 2023, Dr. Whitton became a professor emeritus at Scripps Research Institute. (Ex. I, p. 1; Tr. 267.) He has published over 200 articles, including publications on both the adaptive and innate immune responses and molecular mimicry. (Ex. D, pp. 2-13; Ex. C, p. 1.)

vaccine was not associated with any safety concerns); Dejan Jakimovski et al., *Infections, Vaccines and Autoimmunity: A Multiple Sclerosis Perspective*, 8 VACCINES 1 (2020) (Ex. C, Tab 5) (narrative review concluding that there is no evidence to support an association between vaccination and an increased risk of multiple sclerosis)); Tr. 276-80.) Dr. Whitton further emphasizes that vaccinations are recommended for patients with multiple sclerosis. (Ex. C, p. 5 (citing Mauricio F. Farez et al., *Practice Guideline Update Summary: Vaccine-Preventable Infections and Immunization in Multiple Sclerosis: Report of the Guideline Development*, *Dissemination, and Implementation Subcommittee of the American Academy of Neurology*, 93 NEUROLOGY 584 (2019) (Ex. C, Tab 6); AM. ACAD. NEUROLOGY, PRACTICE GUIDELINE: INFECTIONS AND VACCINE USE IN MULTIPLE SCLEROSIS (2019) (Ex. C, Tab 7)).) However, he admits that a policy recommending vaccinations for individuals with multiple sclerosis does not indicate that a vaccine can never cause an exacerbation of multiple sclerosis. (Tr. 349-50.)

When asked about Langer-Gould et al, Dr. Whitton testified that he does not dispute the authors findings that "[t]he short-term increase in risk suggests that vaccines may accelerate the transition from subclinical to [o]vert autoimmunity in patients with existing disease." (Tr. 353 (quoting Langer-Gould et al., *supra*, at Ex. A, Tab 15, p. 7).) He stresses that this finding leaves open the possibility, but does not confirm, that vaccines can accelerate a relapse in an individual with pre-existing multiple sclerosis. (*Id.* (discussing Langer-Gould et al., *supra*, at Ex. A, Tab 15).) Dr. Whitton emphasizes that this finding only indicates that there is a possibility that a vaccine can merely accelerate something that would have happened anyway. (*Id.* (discussing Langer-Gould et al., *supra*, at Ex. A, Tab 15).) However, he opines that Langer-Gould et al. does not show that vaccinations increase the risk of a relapse. (*Id.* at 355.)

Dr. Whitton summarizes Dr. Steinman's theory generally and acknowledges that molecular mimicry is a real theory; however, he notes that "it is very difficult to trigger disease *via* molecular mimicry." (Ex. C, p. 6 (citing J. Lindsay Whitton & Robert S. Fujinami, *Viruses as Triggers of Autoimmunity: Facts and Fantasies*, 2 CURRENT OP. MICROBIOLOGY 392 (1999) (Ex. C, Tab 11)); Tr. 284-85.) Dr. Whitton states that molecular mimicry is not uncommon, noting that it can be demonstrated in plenty of healthy people. (Tr. 282.) Therefore, he argues that the existence of molecular mimicry alone is insufficient to demonstrate that molecular mimicry is the cause of disease. (*Id.* at 282-83, 286-89.)

For molecular mimicry to cause a disease, three steps must be satisfied. (Ex. C, pp. 8-9; Tr. 281-83.) First, the shared sequence in the vaccine protein must induce an adaptive immune response involving antibodies or T cells. (Ex. C, p. 8; Tr. 281-82.) Second, those antibodies or T cells induced by the vaccine peptide must recognize and cross react with the proposed homologous sequence in the host protein. (Ex. C, p. 8; Tr. 282.) Lastly, the cross-reactive immune response must have the harmful and deleterious effect of causing the disease. (Ex. C, pp. 8-9; Tr. 282-83.) If any of the three steps fail, one cannot conclude that the vaccine caused the disease by molecular mimicry. (Ex. C, pp. 8-9; Tr. 283-84.) Dr. Whitton opines that it is extraordinarily difficult

to induce disease via molecular mimicry, contending that evidence implicating molecular mimicry as a frequent cause of disease is lacking. (Ex. C, pp. 9-10; Tr. 284-85, 330 (discussing N.R. Rose & I.R. Mackay, *Molecular Mimicry: A Critical Look at Exemplary Instances in Human Diseases*, 57 CELLULAR & MOLECULAR LIFE SCIS. 542 (2000) (Ex. C, Tab 12); INSTITUTE OF MEDICINE, ADVERSE EFFECTS OF VACCINES: EVIDENCE AND CAUSALITY 57 (Stratton et al. eds., 2012) [hereinafter 2012 IOM Report] (Ex. C, Tab 13)).)

Dr. Whitton criticizes Dr. Steinman's reliance on BLAST searches. (Ex. C, pp. 10-16.) Specifically, he argues that he is not aware of any data that validates the use of BLAST searches to identify immunologically relevant short homologies in the way that Dr. Steinman does. (Tr. 292-93, 309; Ex. C, p. 11 (citing Cheryl A. Kerfeld & Kathleen M. Scott, *Using BLAST to Teach "E-value-tionary" Concepts*, 9 PLOS BIOLOGY e1001014 (2011) (Ex. C, Tab 14)).) Dr. Whitton explains that certain criteria must be met to identify a possible immunologically relevant homology via a BLAST search: first, the length of the homology must be at least 80 amino acids, and, second, at least 35%, or 28 out of 80, of those amino acids must be identical between the two sequences. (Ex. C, p. 12; Tr. 294-95 (discussing Silvanovich et al., *supra*, at Ex. C, Tab 15).) Additionally, a third criteria must be met in that the E-value, which is a measure "that describes the number of hits one can 'expect' to see by chance when searching a database of a particular size," must be below $3.9 \times 10^{-7}$. (Ex. C, pp. 12-13; Tr. 301-02 (discussing Silvanovich et al., *supra*, at Ex. C, Tab 16).) He stresses that Silvanovich et al. advised discarding any homology with an E-value greater than the threshold of $3.9 \times 10^{-7}$. (Ex. C, p. 13; Tr. 302-03.) Only when all three of these criteria are met, can one conclude that the BLAST-identified homologies are of possible immunological significance. (Tr. 302.)

In response to Dr. Steinman's argument that a length of 80 amino acids is not immunologically relevant, Dr. Whitton agrees that antibodies do not recognize 80 amino acids. (Tr. 296-97, 300-01.) However, Dr. Whitton argues that Dr. Steinman's conclusion is misleading because, while most antibodies recognize small epitopes, the epitopes are discontinuous and encoded in much longer segments of protein. (*Id.* at 296-301.) Accordingly, this explains why the Silvanovich et al. criterion is to look at longer homologies. (*Id.* at 299-301.)

After conducting a BLAST search comparing the diphtheria toxoid component of the Menactra vaccine with the human contactin-2 protein, Dr. Steinman focuses on the diphtheria toxoid sequence FQVVHNSYNR and the human contactin-2 sequence FEVKIRSYNR. (Ex. C, pp. 13, 17; Tr. 306-07.) With regard to this identified sequence, Dr. Whitton argues that none of the Silvanovich et al. criteria are satisfied because (1) the sequences are only 10 amino acids in length; (2) the sequences only share 6 identical amino acids; and (3) the E-value is 6.3, which is "millions of times higher than is required." (Ex. C, pp.13-14; Tr. 305-07.) Accordingly, Dr. Whitton contends that this potential homology identified by Dr. Steinman is not of demonstrable immunological

significance.[10] (Tr. 307-08; Ex. C, p. 14.) Thus, Dr. Whitton concludes that there is "no evidence at all that any of the diphtheria toxoid amino acids on which he relies can trigger an immune response that can cross-react with contactin. So no evidence provided for molecular mimicry." (Tr. 308.)

Dr. Whitton disputes Dr. Steinman's assertion that a short homology between a vaccine and a host protein must induce molecular mimicry. (Tr. 316.) He reiterates that "the vast majority of short homologies have no meaningful biological effect." (Ex. C, p. 15 (emphasis omitted); Tr. 314-15.) To illustrate this point, Dr. Whitton performed a BLAST search comparing two flu vaccine proteins from different flu viruses, which identified hundreds of homologies that, under Dr. Steinman's theory, would be considered immunologically relevant. (Ex. C, pp. 15-16; Tr. 315.) Dr. Whitton explains that if these homologies were molecular mimics, you would expect cross-reactivity, and if this cross-reactivity was biologically relevant, then the antibodies induced by one viral protein should neutralize the other virus and vice versa. (Tr. 315; Ex. C, p. 16.) Therefore, only one of the viral proteins would need to be included in the flu vaccine to protect against both viruses. (Ex. C, p. 16; Tr. 315.) However, in reality, proteins from three to four different flu viruses are included in the flu vaccine because the immune response trigged by the protein from one virus does not protect against the other virus, despite the large number of shared short homologies. (Ex. C, p. 16; Tr. 316.)

Dr. Whitton also criticizes Dr. Steinman's filter funnel approach. (Ex. C, pp. 17-19.) He reiterates that Dr. Steinman's BLAST search yielded chance homologies that should not have been further analyzed. (*Id.* at 17.) However, Dr. Steinman feeds his homologies through the IEDB. (*Id.*; Tr. 319.) Dr. Whitton explains that Dr. Steinman uses the lowest stringency search, 70% homology/similarity. (Ex. C, p. 17; Tr. 319.) When Dr. Whitton searched the IEDB for the exact vaccine peptide at issue, FQVVHNSYNR, it yielded no results, which indicates that the peptide is not known to be an epitope. (Ex C, pp. 17-18; Tr. 319-20.) However, because Dr. Steinman applied the lowest stringency search, he obtained 14 hits. (Ex. C, pp. 17-18; Tr. 319-20.) Moreover, Dr. Whitton stresses that among the 14 hits that Dr. Steinman received, contactin-2 is not listed, indicating that the sequence FEVKIRSYNR in that human protein is not known to be recognized by the human immune system. (Ex. C, p. 18.) Additionally, of the five diphtheria toxin hits, only one comes from humans, which is the Raju et al. paper. (*Id.*; Tr. 320.)

---

[10] Dr. Whitton offered extensive criticism of Dr. Steinman's reliance on an article by Root-Bernstein to support his argument that a sequence sharing five of nine identical amino acids or six of 10 identical amino acids is a sufficient degree of homology to trigger neuroinflammation. (Ex. C, pp. 14-15 (discussing Root-Bernstein, *supra*, at Ex. 42).) Dr. Whitton opines that this paper contains "several truly egregious errors." (*Id.* at 14.) Specifically, he notes that the author misinterpreted a high E value as indicative of significance when a low E value actually indicates statistical significance. (*Id.*) Additionally, he criticizes the author for adopting an Expect threshold of 10,000 when performing a BLAST search, when the default setting is 10. (*Id.*) Dr. Whitton contends that such a practice ensures the production of even more hits that are of no biological relevance. (*Id.*) In summary, Dr. Whitton opines that this paper used BLAST incorrectly and drew conclusions about molecular mimicry that are completely unjustified. (*Id.* at 15.) Therefore, the fact that Dr. Steinman relies on this paper to validate his own BALST search methods is highly problematic. (*Id.* at 14-15.)

When questioned about Dr. Steinman's reliance on Raju et al., Dr. Whitton testified that all this article shows is that humans can respond to the vast majority of the diphtheria toxin. (Tr. 317 (discussing Raju et al., *supra*, at Ex. 43).) He states that almost every part of the diphtheria toxin appears to be able to trigger a human CD4+ T cell response. (*Id.* at 320 (discussing Raju et al., *supra*, at Ex. 43).) However, Dr. Whitton emphasizes that this article does not tell us anything about antibodies. (*Id.* at 317, 320.) While one could argue that the findings of Raju et al. come close to fulfilling the first step of molecular mimicry, which requires that the vaccine component induce an adaptive immune response, Dr. Whitton contends that the first step is not satisfied in this case because an exact search of the identified vaccine peptide in IEDB was negative. (*Id.* at 317-18, 320-21.) More importantly, he stresses that Raju et al. does not tell us anything about the proposed cross-reactivity of contactin-2. (*Id.* at 318, 321.) Additionally, Dr. Whitton testified that the IEDB is not constructed to demonstrate cross-reactivity, nor does it tell us anything about disease. (*Id.*) Accordingly, while the IEDB may be helpful with respect to the first step of molecular mimicry, it cannot be relied on for fulfilling steps two or three. (*Id.* at 321.)

Furthermore, Dr. Whitton also takes issue with Dr. Steinman's fourth and final stage in his filter funnel, which is labeled as "Immune Attack to this Epitope could cause neuroinflammation including ADEM and multiple sclerosis." (Ex. C, pp. 18-19.) First, Dr. Whitton argues that Dr. Steinman's conclusion constitutes circular logic. (*Id.* at 19.) Because Dr. Steinman began his search by comparing the diphtheria toxoid protein against contactin-2, which was preselected as the host protein due to its possible involvement in multiple sclerosis, and entered one of those search results into the top of his filter funnel, it is 100% certain that any homologies that emerge from the bottom of the filter funnel will be present in those two proteins. (*Id.*) Second, Dr. Whitton reiterates that short homologies are found whenever two proteins are compared. (*Id.*) Therefore, Dr. Whitton alleges that this approach allows Dr. Steinman to "cherry-pick" a host protein that may be implicated in the disease at issue with certainty that he will always find some homologies between that host protein and the vaccine protein. (*Id.*)

Dr. Whitton argues that the unreliability of Dr. Steinman's blast search and filter funnel approach is revealed when his approach is applied to other vaccines. (Ex. C, pp. 19-23.) He performed his own searches using the hepatitis B and HPV vaccines to demonstrate that one can always replicate Dr. Steinman's hypothesis based on short homologies and the IEDB. (*Id.*; Tr. 323-24.) Employing Dr. Steinman's criteria for identifying a sequence and applying his BLAST search and filter process approach, Dr. Whitton's search results relative to the hepatitis B vaccine satisfied both of Dr. Steinman's criteria. (Ex. C, pp. 20-21.) However, because there is scientific evidence that shows that the hepatitis B vaccine does not trigger multiple sclerosis in children and is safe for those with multiple sclerosis, Dr. Whitton contends that fulfillment of both of Dr. Steinman's criteria illustrates that his approach and conclusions are unreliable.[11]

---

[11] Dr. Whitton cited studies to support his contention that the hepatitis B vaccine does not trigger or exacerbate multiple sclerosis. (Ex. C, pp. 5, 20 (citing Yann Mikaeloff et al., *Hepatitis B Vaccination and the Risk of Childhood-Onset Multiple Sclerosis*, 161 ARCHIVES PEDIATRIC & ADOLESCENT MED. 1176 (2007)

(*Id.*) Dr. Whitton's search relative to the HPV vaccine revealed similar results. (*Id.* at 21-23; Tr. 324.) Again, Dr. Whitton explains that "there has been no epidemic of [multiple sclerosis] in HPV-vaccinated children over the past decade," which, according to Dr. Whitton, speaks "to the flaws in Dr. Steinman's approach, and to the unreliability of the conclusions that he draws therefrom." (Ex. C, p. 23; *see also* Tr. 324-25.)

In his second report, Dr. Whitton addresses studies that have identified an association between EBV and multiple sclerosis. (Ex. E, pp. 2-7; Wekerle, *supra*, at Ex. 47; Lanz et al., *supra*, at Ex. 48; Robinson & Steinman, *supra*, at Ex. 49; Kjetil Bjornevik et al., *Longitudinal Analysis Reveals High Prevalence of Epstein-Barr Virus Associated with Multiple Sclerosis*, 375 SCIENCE 296 (2022) (Ex. E, Tab 2)).) He states that Bjornevik et al. tells us that EBV infections are the probable initial trigger for multiple sclerosis. (Tr. 328 (discussing Bjornevik et al., *supra*, at Ex. E, Tab 2).) While the authors investigated whether other infections increased the risk of developing multiple sclerosis, they concluded that other infections did not trigger the disease. (*Id.* at 332 (discussing Bjornevik et al., *supra*, at Ex. E, Tab 2).) Dr. Whitton opines that this conclusion is important because it demonstrates that multiple sclerosis is "not caused by some kind of random immunological activation as would occur with many viruses and many vaccines, but, rather, it's a very specific association with Epstein-Barr virus." (*Id.*)

Like Dr. Steinman, Dr. Whitton acknowledges that vast majority of adults have been infected with EBV and continue to carry a latent form of the virus. (Tr. 333; Ex. E, p. 4.) He also recognizes that a second hit theory is a reasonable hypothesis; however, he opines it lacks supporting evidence. (Tr. 335.) Given the ubiquity of EBV infection, Dr. Whitton argues that studies finding no association between vaccines and multiple sclerosis were carried out in populations that were almost uniformly positive for EBV infection, which cuts against a conclusion that vaccines can trigger multiple sclerosis by acting as a second hit. (Ex. E, p. 4; Tr. 333-34.) Further, he notes that Bjornevik et al. found that infection with other viruses did not increase the risk of multiple sclerosis, which also argues against the hypothesis that a second hit from another virus plays a major role in multiple sclerosis etiology. (Tr. 334-35 (discussing Bjornevik et al., *supra*, at Ex. E, Tab 2, p. 3).)

With regard to Lanz et al., Dr. Whitton testified that his concern is not with the paper itself but rather with the way Dr. Steinman interprets the article. (Tr. 328; Ex. E, p. 3 (discussing Lanz et al., *supra*, at Ex. 48).) He explains that Dr. Steinman tends to say that Lanz et al. indicates that EBV triggers multiple sclerosis via molecular mimicry, a conclusion that Dr. Whitton maintains is unsupportable. (Tr. 328; Ex. E. p. 3 (discussing Lanz et al., *supra*, at Ex. 48).) Dr. Whitton acknowledges that Lanz et al. unequivocally shows that molecular mimicry between a protein from EBV, EBNA-1, and a human protein, GlialCAM, has been demonstrated in some individuals with multiple sclerosis. (Tr. 328-29 (discussing Lanz et al., *supra*, at Ex. 48).) However, Dr. Whitton contends that Lanz et al. does not rise to the level of demonstrating that this molecular mimicry triggers multiple sclerosis. (*Id.* at 329, 331 (discussing Lanz et al., *supra*, at Ex.

(Ex. C, Tab 8); Yann Mikaeloff et al., *Hepatitis B Vaccine and Risk of Relapse After a First Childhood Episode of CNS Inflammatory Demyelination*, 130 BRAIN 1105 (2007) (Ex. C, Tab 9)).)

48).) While he acknowledges that it is possible that EBV triggers multiple sclerosis via molecular mimicry (Ex. E, p. 5), he argues that there is no reliable evidence supporting that causal mechanism and states that other explanations are far more probable (Tr. 335; Ex. E, p. 5).

When asked what evidence he would look for to be comfortable with the conclusion that molecular mimicry is a biologically plausible explanation, Dr. Whitton testified that he would like to see good animal studies that show that molecular mimicry causes multiple sclerosis. (Tr. 344-45.) While Lanz et al. demonstrates coexistence between molecular mimicry and multiple sclerosis, Dr. Whitton states that it fails to tie molecular mimicry to multiple sclerosis causally. (*Id.* at 346.) Therefore, Lanz et al. does not satisfy the third step required to conclude that molecular mimicry is the cause of disease. (*Id.*) To satisfy the third step, Dr. Whitton would like to see an experiment with an EAE model where the GlialCAM peptide, along with the usual stuff that you put in with peptides, is injected into mice and shown to cause EAE. (*Id.* at 346-347.) However, he notes that such an experiment was not reported in Lanz et al. (*Id.* at 347.)

Additionally, Dr. Whitton questions the relevance of Lanz et al. in the present case. (Ex. E, pp. 3-5.) He notes that the paper focuses on EBV and its cross-reactivity with GlialCAM. (*Id.* at 3 (discussing Lanz et al., *supra*, at Ex. 48).) However, this case involves the Menactra vaccine, not EBV. (*Id.*) Accordingly, Dr. Whitton stresses that these two proposed causes of multiple sclerosis "differ not only in terms of the specific antigens that they contain, but also in the fact that one of the proposed causes (EBV) is a live virus [and] the other alleged cause (Menactra vaccine) is a non-live vaccine." (*Id.* at 3-4.) He also disputes Dr. Steinman's characterization of GlialCAM as a "CNS protein," noting that GlialCAM is in no way specific to the central nervous system as it was discovered in the liver. (*Id.* at 4.) Assuming cross-reactivity between EBNA-1 and GlialCAM causes multiple sclerosis via molecular mimicry, as proposed by Dr. Steinman, Dr. Whitton questions why EBV does not also cause fulminant autoimmune hepatitis. (*Id.*) Lastly, Dr. Whitton notes that GlialCAM is a transmembrane protein embedded in the cell membrane, with part of the protein inside the cell and the other part outside the cell. (*Id.*) The antibody of focus in Lanz et al. recognizes a part of the GlialCAM protein that lies inside the cell. (*Id.* (discussing Lanz et al., *supra*, at Ex. 48, pp. 3-4).) Therefore, Dr. Whitton suggests that it is more likely that the antibody that causes disease "cross-reacts with GlialCAM only after the neuron has been damaged" by other EBV-related means that expose the intracellular part of the protein. (*Id.* at 4-5.)

Dr. Whitton emphasizes the Lanz et al. did not utilize a BLAST search, which he argues supports his opinion that BLAST is an unreliable approach for identifying short amino acid sequences of potential immunological importance. (Ex. E, p. 5.) Accordingly, Dr. Whitton ran two BLAST searches related to the findings in Lanz et al. First, he ran a search comparing GlialCAM against EBNA-1, which found no significant similarity. (*Id.*; Tr. 336.) Dr. Whitton argues that based on Dr. Steinman's own logic, an absence of a homology would support a conclusion that molecular mimicry does not occur between these two proteins. (Ex. E, p. 6; Tr. 336-37.) However, given that Lanz et al. unequivocally demonstrates molecular mimicry between GlialCAM and EBNA-1,

Dr. Whitton stresses that the search results finding no homology stand in conflict with the findings of that study. (Ex. E, p. 6; Tr. 336-37.) Therefore, Dr. Whitton concludes that Lanz et al. support his opinion that BLAST searches are unreliable and of extremely limited utility in showing molecular mimicry. (Tr. 337.)

In addition, Dr. Whitton proposes that, if short peptides in the EBNA-1 protein triggers multiple sclerosis by inducing an immune response that cross reacts with the homologous GlialCAM sequences, as argued by Dr. Steinman in Lanz et al., then BLASTing the EBNA-1 protein against the human proteome would identify a very specific homology with GlialCAM and no other better protein homologies should be identified. (Ex. E, p. 6.) He took the two peptide sequences from EBNA-1 that Dr. Steinman identified as playing a role in molecular mimicry and performed a BLAST search to identify homologies in human proteins with this peptide from EBNA-1. (*Id.* at 6-7; Tr. 337.) The search of the first peptide revealed no detectable homologies with GlialCAM, and, while the second peptide did share homologies with GlialCAM, several more salient homologies were identified. (Ex. E, pp. 6-7; Tr. 337-38.) Again, Dr. Whitton contends that these search results support his opinion that BLAST searches are "totally unreliable in immunological terms when you're looking for short homologies." (Tr. 337-38.)

Dr. Whitton also addresses Dr. Steinman's BLAST searches comparing GlialCAM to contactin-2 and the diphtheria toxin. (Ex. E, pp. 7-10.) First, Dr. Whitton expresses confusion as to why Dr. Steinman wants to link GlialCAM and contactin-2, given that GlialCAM is recognized by an EBNA-1 antibody and Dr. Steinman's theory in this case rests on a contactin-2 being recognized by an antibody induced by the diphtheria toxoid. (*Id.* at 8.) While Dr. Steinman's BLAST search comparing contactin-2 and GlialCAM reveals that these proteins are evolutionarily related, Dr. Whitton stresses that there is no evidence that these two proteins are immunologically related. (*Id.* at 9.) As for the BLAST search between GlialCAM and diphtheria toxin, Dr. Whitton contends that the E-values show that these homologies are the result of chance. (*Id.* at 10.)

Dr. Whitton testified that assuming there was sufficient evidence to conclude that molecular mimicry caused petitioner's significant aggravation of multiple sclerosis, he would expect to see the onset of this exacerbation between 6-30 days post-vaccination. (Tr. 363.) Therefore, although he disagrees that the Menactra vaccine more likely than not caused a significant aggravation of petitioner's relapsing-remitting multiple sclerosis, Dr. Whitton does not have any issue with the timing element of Dr. Steinman's proposed causal theory. (*Id.*)

## V. Analysis

### a. *Loving* prongs one through three

Under the Vaccine Act, a "significant aggravation" of a condition is "any change for the worse in a preexisting condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health." § 300aa-33(4). In order

to determine when this has occurred, the first three prongs of the *Loving* test examine (1) the vaccinee's condition prior to the administration of the vaccine at issue; (2) the vaccinee's condition post-vaccination; and then (3) assess whether the vaccinee's post-vaccination condition constitutes a significant aggravation of his pre-vaccination condition. *Loving*, 86 Fed. Cl. at 144. Although petitioner need not prove the expected outcome of his pre-vaccination condition or that his post-vaccination condition is worse than the expected outcome, *Sharpe v. Sec'y of Health & Human Servs.*, 964 F.3d 1072, 1081 (Fed. Cir. 2020), petitioner still must show that his post-vaccination condition was affected by his vaccination, *i.e.*, that the vaccination was a substantial factor in causing the injury. *Locane v. Sec'y of Health & Human Servs.*, 685 F.3d 1375, 1381-82 (Fed. Cir. 2012).

In this case, there is no dispute that relapsing-remitting multiple sclerosis is the appropriate and correct diagnosis for petitioner. (ECF No. 64, p. 1; Ex. 19, pp. 1-2; Ex. A, p. 9; Tr. 77, 178-79.) And, although this diagnosis was not made until after petitioner received the Menactra vaccine at issue, the parties also agree that the onset of petitioner's multiple sclerosis occurred prior to vaccination. (ECF No. 64, p. 1; ECF No. 71, p. 15; Ex. 19, pp. 9-10; Ex. A, pp. 9, 12; Tr. 52, 190-91.) Thus, it was a pre-existing condition. Moreover, it is undisputed that in late January of 2018, after receipt of the Menactra vaccination at issue, petitioner experienced new symptoms, which led to the relapsing-remitting multiple sclerosis diagnosis. (ECF No. 64, p. 1; ECF No. 70, pp. 10-11; ECF No. 71, p. 16; Ex. A, p. 12; Tr. 52, 87, 194-95.) That is, on or around January 25, 2018, approximately two weeks post-vaccination, petitioner started experiencing vomiting, double vision, clumsiness, and right-sided numbness, tingling, and weakness. (Ex. 1, p. 5; Ex. 7, pp. 244, 318.) While petitioner's vomiting resolved after a few days, his other symptoms persisted, which led to his hospitalization and required treatment with high-dose steroids and rituximab, as well as physical and speech rehabilitation. (Ex. 1, p. 5, Ex. 6, pp. 11-12. *See generally* Exs. 2, 4, 7, 58.) Petitioner's MRI of January 30, 2018 revealed lesions disseminated in space and in time, which his treating neurologists indicated was a finding consistent with his ultimate diagnosis of relapsing-remitting multiple sclerosis. (Ex. 7, p. 248.) Thus, both Dr. Steinman and Dr. Holmes agree that petitioner suffered a relapse of his multiple sclerosis in late January of 2018 with new symptoms, including right-sided numbness, tingling, and weakness.[12] (Ex. A, pp. 9, 12; Ex. 19, p. 27; Tr. 58-59, 194-95.)

Nonetheless, the parties dispute whether petitioner's relapse in late January of 2018 constitutes a significant aggravation of his multiple sclerosis. (ECF No. 70, pp. 12-13; ECF No. 71, pp. 15-17; ECF No. 74, pp. 5-6.) Respondent contends that to meet his burden under *Loving* prong three, petitioner must show that the worsening in his condition post-vaccination was due to the receipt of the vaccination at issue and not explained by the expected clinical course of his pre-existing relapsing-remitting multiple sclerosis. (ECF No. 71, p. 15 (citing *Locane*, 685 F.3d at 1381-82).) Specifically, he argues that Dr. Steinman "did not address the expected clinical course of [multiple

[12] Dr. Steinman and Dr. Holmes disagree as to whether the vomiting and double vision that petitioner also experienced in late January of 2018 were likely related to his multiple sclerosis (Tr. 56-57, 141, 215-17); however, this issue is discussed below under *Loving* prong five.

sclerosis], and he did not explain how petitioner's post-vaccination symptoms deviated from the expected clinical course of his pre-vaccination relapsing remitting [multiple sclerosis]." (*Id.* at 16.) Moreover, respondent maintains that Dr. Holmes is persuasive in opining that petitioner's relapse in late January of 2018 was consistent with the expected clinical course of petitioner's relapsing-remitting multiple sclerosis, and that the symptoms he experienced post-vaccination can be attributed to the "expected evolution and progression" of his condition. (*Id.*)

However, petitioner stresses that *Loving* prong three only requires a comparison of petitioner's pre-vaccination and post-vaccination condition. (ECF No. 70, p. 13; ECF No. 74, pp. 5-6 (citing *Sharpe*, 964 F.3d at 1082).) Petitioner emphasizes that pre-vaccination, his relapsing-remitting multiple sclerosis was mild, quiescent, and largely asymptomatic, whereas post-vaccination, he developed active relapsing-remitting multiple sclerosis with a range of new, debilitating symptoms requiring treatment with steroids and rituximab and ongoing neurological monitoring. (ECF No. 70, pp. 12-13; ECF No. 74, p. 6.) Accordingly, petitioner maintains that there is "uncontroverted evidence" that his post-vaccination condition constitutes a significant aggravation of his pre-existing relapsing-remitting multiple sclerosis. (ECF No. 70, pp. 12-13; ECF No. 74, pp. 5-6.) I agree with petitioner.

Dr. Holmes predicated his opinion that petitioner's relapse does not constitute a significant aggravation on the fact that petitioner's relapse involved new symptoms with corresponding new lesions, rather than an exacerbation of an existing lesion. (Ex. A, p. 12; Ex. F, p. 3.) However, this is too narrow of an understanding of a significant aggravation. The question is not whether a specific pre-existing lesion worsened, but rather whether petitioner's "condition," *i.e.*, his pre-existing multiple sclerosis, worsened. § 300aa-33(4). On that point, Dr. Steinman was persuasive in opining that a relapse, as distinct from an exacerbation more broadly, connotes a decompensation in a patient with multiple sclerosis that includes significant disability. (Tr. 85-86.) Thus, a relapse can be equated to the legal concept of significant aggravation in this case because "it's something that worsened his trajectory and is significant. . . . It's a big thing that didn't get better." (*Id.* at 85.) Moreover, it is not logical to suggest, as Dr. Holmes implicitly seems to do, that the development of a new lesion related to petitioner's multiple sclerosis would not constitute a worsening of the multiple sclerosis.

Relatedly, although Dr. Holmes testified that petitioner's relapsing-remitting multiple sclerosis followed the expected clinical course for pediatric patients (Tr. 179, 240-41), Dr. Holmes's contention that there is an expected clinical course for pediatric-onset relapsing-remitting multiple sclerosis is undercut by medical literature that he filed to support his opinion. Jeong et al. recognized that "[t]he clinical course and phenotype of multiple sclerosis is highly variable." (Jeong et al., *supra*, at Ex. A, Tab 5, p. 1.) Additionally, Boiko et al. acknowledged that some cases of pediatric-onset relapsing-remitting multiple sclerosis involve a very benign course where others involve a malignant course with early development of disability. (Boiko et al., supra, at Ex. A, Tab 1, p. 4.) Buljevac et al. noted the unpredictable character of multiple sclerosis relapses, specifically the onset and duration, which provokes uncertainty. (Buljevac et al., *supra*,

at Ex. G, Tab 3, p. 1.) Renoux et al. reported that the mean time from the onset of multiple sclerosis to the second neurological event is highly variable, estimated to be between 11 and 71.3 months, and noted that it can take many years, even decades, for a second demyelinating event to occur. (Renoux et al., *supra*, at Ex. A, Tab 3, p. 3; *see also* Boiko et al., *supra*, Ex. A, Tab 1, p. 3, tbl. 2 (reporting 71.32 months as the mean duration of the first remission).) Dr. Steinman, by contrast, is persuasive in opining that there is no known trajectory for pediatric-onset relapsing-remitting multiple sclerosis. (Tr. 78, 139.) He explained that there is a large amount of uncertainty regarding the future course of an individual's relapsing-remitting multiple sclerosis, noting that it is impossible to know how any given patient's condition will progress. (*Id.* at 78.) Dr. Steinman has expertise in multiple sclerosis and has treated more patients with the condition in his clinical practice, a point which Dr. Holmes conceded during his testimony. (*Id.* at 216-17.) Accordingly, I find Dr. Holmes's contention that petitioner's post-vaccination condition was consistent with an identifiable, expected clinical course of the disease is less persuasive.

Further to this point, Dr. Holmes's own causal opinion is in any event inconsistent with the idea that any multiple sclerosis relapse is merely a product of the natural course of relapsing-remitting multiple sclerosis. While Dr. Holmes disagreed that petitioner's vaccine caused his relapse, he otherwise opined that a viral infection was a likely cause of the relapse. (Tr. 213.) This necessarily encompasses an opinion that multiple sclerosis relapses are multifactorial and affected by external stimuli, rather than simply constituting the course of the disease. For example, Buljevac et al., cited by Dr. Holmes, explains that, in multiple sclerosis, "fluctuations in disease activity are related to alterations in (auto-)immune activity. Exacerbations lead to short-term morbidity, but may also influence long-term disability." (Buljevac et al., *supra*, at Ex. G, Tab 3, p. 1.) Petitioner is obligated only to demonstrate that his condition was "affected" by his vaccination, rather than demonstrating that that his post-vaccination condition is worse than the expected outcome of the condition. *Compare Sharpe*, 964 F.3d at 1082 (explaining that *Loving* prong three requires only a comparison of petitioner's current, post-vaccination condition to the pre-vaccination condition, rather than the expected outcome of the condition), *with Locane*, 685 F.3d at 1381 (finding no error where the special master concluded that "the course of Ms. Locane's condition was not inconsistent with the disease generally and not affected by the vaccinations").

Accordingly, consistent with the Vaccine Act's definition of significant aggravation, I find that there is preponderant evidence that petitioner's relapse in late January of 2018 represents a change for the worse in his multiple sclerosis, resulting in markedly greater disability, pain, or illness accompanied by substantial deterioration of health. § 300aa-33(4). This leaves only the question of whether that significant aggravation was related to the Menactra vaccination at issue.

### b. *Loving* prong four

Petitioner's burden under the fourth *Loving* prong is to preponderantly show "a medical theory causally connecting such a significantly worsened condition to the

vaccination." *Loving*, 86 Fed. Cl. at 144; *Althen*, 418 F.3d at 1278. While petitioner's theory needs not be "medically or scientifically certain," it must be "legally probably" and based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994). Petitioner's burden under *Loving* prong four varies from what his burden would be under *Althen* prong one in that a significant aggravation claim requires a showing that the subject vaccine can worsen the condition at issue, rather than be its cause. *Sharpe*, 964 F.3d at 1083 (explaining that "[u]nder *Loving* prong 4, a petitioner need only provide a 'medical theory causally connecting [petitioner's] significantly worsened condition to the vaccination.' In other words, Petitioner was required to present a medically plausible theory demonstrating that a vaccine 'can' cause a significant worsening of [petitioner's injury]" (second alteration in original) (internal citation omitted)).

In this case, the record evidence confirms that multiple sclerosis relapses are multifactorial and that it is reasonable to conclude that they can be triggered by subclinical inflammation, which I further find can include the immune response to the Menactra vaccine. Because of this, I do not find it necessary to resolve whether the specific molecular mimics proposed by Dr. Steinman are preponderantly supported.[13] *See Sword v. United States*, 44 Fed. Cl. 183, 188 (1999) (explaining that "[n]o judge or jury can be forced to accept or reject an expert's opinion or a party's theory at face value. To require such a choice in this context is to neglect the Special Master's duty to 'vigorously and diligently investigate the factual elements' underlying the petition"). Instead, it is sufficient that the record evidence as a whole preponderantly demonstrates that the inflammatory effects of the Menactra vaccine can likely interact with the pathophysiology of multiple sclerosis to result in a relapse. Afterall, petitioners are not obligated to prove a specific biologic mechanism. *Knudsen*, 35 F.3d at 549.

As explained in the preceding section, even Dr. Holmes's causal opinion on respondent's behalf establishes that multiple sclerosis relapses can be caused by immune stimuli. Specifically, he opines that individual multiple sclerosis relapses, including the relapse at issue in this case, can be triggered by infection. (Ex. G, p. 2; Tr. 213.) Dr. Holmes explained on respondent's behalf that multiple sclerosis is a chronic inflammatory disorder in which lymphocytic infiltration leads to damage in the central nervous system. (Ex. A, p. 9, Tr. 179-80.) In the case of relapsing-remitting multiple sclerosis, this involves "clearly defined attacks of new or increasing neurologic symptoms," *i.e.*, relapses. (Ex. A, p. 12; Tr. 181.)

To that point, Dr. Holmes relied on Buljevac et al., a 2002 longitudinal study of 73 patients with relapsing-remitting multiple sclerosis that assessed the association between systemic infections and "exacerbations." (Buljevac et al., *supra*, at Ex. G, Tab 3, pp. 1-2.) An exacerbation was defined as a worsening of existing symptoms or the

---

[13] Notably, however, Dr. Steinman successfully presented a similar molecular mimicry theory in a prior case, decided by another special master, in which the petitioner alleged that her multiple sclerosis was caused-in-fact by the Menactra vaccination. *Giannetta v. Sec'y of Health & Human Servs.*, No. 13-215V, 2017 WL 4249946 (Fed. Cl. Spec. Mstr. Sep. 1, 2017).

appearance of new symptoms lasting more than 24 hours after a period of at least 30 days of improvement or stability.[14] (*Id.* at 2-3.) To assess the relationship between infections and exacerbations, the authors defined an at-risk period of two weeks before and five weeks after the onset of a clinical infection. (*Id.* at 3.) The authors observed an increased risk of exacerbations during the at-risk period, which they noted was consistent with the findings of prior studies. (*Id.* at 4, 7.) This increased risk of exacerbations was not associated with any specific type of clinical infection. (*Id.* at 4.) Dr. Holmes testified that he "really liked" the Buljevac study before going on to acknowledge that the authors had observed that "[i]t seems likely that a variety of viruses or other pathogens that mimic viral upper respiratory infections, such as chlamydia pneumonia or mycoplasma pneumonia, are involved." (Tr. 218-29 (quoting Buljevac et al., *supra*, at Ex. G, Tab 3, p. 8).) And, indeed Buljevac et al. states that "[e]xacerbations can result from a variety of pathophysiological events, such as demyelination, inflammation, defects in synaptic transmission and the effect of circulating blocking factors." (Buljevac et al., *supra*, at Ex. G, Tab 3, p. 7.)

Dr. Holmes additionally introduced into the record a study by Langer-Gould et al., which is a 2014 nested case-controlled study conducted among Kaiser Permanente patients in Southern California. (Langer-Gould et al., *supra*, at Ex. A, Tab 15.) Dr. Holmes introduced this into the record to support his contention that there is no epidemiologic support linking vaccines to multiple sclerosis. (Ex. A, p. 10.) However, although no long-term association between vaccines and CNS acute demyelinating syndrome, including multiple sclerosis, was detected, the authors identified a statistically significant increased risk of symptom onset of any CNS acute demyelinating syndrome within the first 30 days following vaccination in individuals under the age of 50 years old. (Langer-Gould et al., *supra*, at Ex. A, Tab 15, pp. 3-5.) Thus, the authors hypothesized that "our findings are consistent with vaccines acting as a proinflammatory cofactor in individuals with subclinical autoimmunity because this mechanism would be expected to hasten symptom onset but not change the long-term risk of developing [multiple sclerosis] or [clinically isolated syndrome]." (*Id.* at 7.)

On petitioner's behalf, Dr. Steinman disputed that Langer-Gould's broader statistical findings undermine petitioner's theory as Dr. Holmes had urged while also explaining that the authors' interpretation of the study data as supporting a role for vaccination as an inflammatory co-factor "augments" petitioner's theory and supports its biological plausibility. (Tr. 136-38.) Respondent's immunology expert, Dr. Whitton, also testified that he does not dispute Langer-Gould's finding that vaccines were associated with a short-term increase in risk of symptom development within 30 days of vaccination. (*Id.* at 353.) He stressed that this is not a finding that the frequency of such cases is increased, but he agreed that "[o]ne can conceptualize a situation where an individual has relapsing-remitting [multiple sclerosis] and is going to have a relapse

[14] The authors appear to use the terms "exacerbation" and "relapse" interchangeably (*see, e.g.*, Buljevac et al., *supra*, at Ex. G, Tab 3, p. 3, fig. 2), though, as noted above, Dr. Steinman stressed that relapses are a more severe form of exacerbation (Tr. 85-86).

in [for example] six weeks. What this study suggests is that a vaccine may accelerate the transition."[15] (*Id.* at 355.)

Thus, I had the following exchange with Dr. Holmes during the hearing:

> THE COURT: . . . So apart from the evidence of the infection itself, is there anything clinically that you would look for in a patient before you would attribute [a multiple sclerosis] relapse to the infection?
>
> THE WITNESS: [In] reality, probably not, no . . . A lot of things can lead to a relapse in patients. I mean, crossing time zones, being overly tired, et cetera. From the patient standpoint [it] doesn't make a whole lot of difference what the triggering thing is . . . .
>
> THE COURT: Okay. So the reason I'm asking is because if I'm reading this Buljevac paper . . . correctly, I think they're identifying a risk period for relapse that actually precedes the onset of symptoms of infection. Is that right?
>
> THE WITNESS: That's correct.
>
> THE COURT: So theoretically, you could have a relapse associated with an infection and actually have no outward clinical evidence of infection.
>
> THE WITNESS: You could . . . And I think the idea would be that, you know, when you get COVID or you get influenza, you get an incubation period where you may be asymptomatic, but that virus[ is] causing dysfunction of your immune system during the incubation period . . . .
>
> THE COURT: Okay. And the reason I'm asking is because I noticed in this paper that . . . [it states at Exhibit G-3, p. 8] "Taking the available data together, we favor the interpretation that the contribution of infections to disease activity is related to components of an inflammatory process that occurs independently of blood-brain barrier dysfunction." And so I'm just – it's striking to me that that is – seems to me to be a very similar conclusion to what Langer-Gould was discussing when they were theorizing that vaccinations could do the same thing.
>
> THE WITNESS: . . . if you get an exacerbation from an immunization, one of the theories would be, well, that maybe breaks down the blood-brain barrier through cytokines and that whole pathway. And they didn't see –

[15] Even this framing alone is consistent with petitioner's burden in a significant aggravation case of presenting a theory by which vaccination can be connected to a worsening of the condition. *Sharpe*, 964 F.3d at 1083; *see also Kottenstette v. Sec'y of Health & Human Servs*., 861 F. App'x 433, 435-36 (Fed. Cir. 2021) (finding no error where the special master found petitioners entitled to compensation based in significant part on a study showing that vaccination resulted in a temporal shift in onset among subjects "in whom the disorder is already destined to develop").

> in prior studies, they did not see any enhancement following immunization. So immunizations do not cause enhancement of MS lesions.
>
> So in this study, they found that the infections did not either. So what they concluded was that the infection was not really due to the blood-brain barrier problem, but probably due to inflammatory markers. . . . So they think that's the reason why you get the exacerbation as opposed to break down the blood-brain barrier. . . .
>
> THE COURT: . . . [L]et me throw a statement out there for you to disagree with.
>
> THE WITNESS: Okay.
>
> THE COURT: Langer-Gould and Buljevac have the same basis hypothesis, which is that a subclinical inflammatory insult can lead to [a multiple sclerosis] relapse.
>
> THE WITNESS: Yes, I think that's fair.[16]

(Tr. 223-26.)

While Dr. Whitton stressed that the Langer-Gould finding only leaves open the possibility, but does not confirm, that a vaccination can lead to a relapse in a patient with pre-existing relapsing-remitting multiple sclerosis (Tr. 353, 355), Dr. Holmes's affirmative reliance on Buljevac et al. to support his argument that a viral infection can and did cause petitioner's relapse validates the theory that a subclinical inflammatory insult can cause a relapse of multiple sclerosis. Even accounting for the nuances of the Langer-Gould findings,[17] nothing on this record adequately explains why in this context subclinical inflammation stemming from a mild infection should be distinguished from subclinical inflammation resulting from vaccination, especially given Dr. Holmes's acknowledgment that "[a] lot of things can lead to a relapse in patients." (*Id.* at 223.) Indeed, Buljevac et al., though positing a distinct role for infections, broadly stated that "any factor that increases inflammatory activity could contribute to neurological deterioration." (Buljevac et al., *supra*, at Ex. G, Tab 3, p. 2.)

---

[16] Buljevac et al. does cite several prior epidemiologic studies, including Confavreux et al., which has also been cited by respondent in this case, for the proposition that vaccinations, in contrast to infections, have not been shown to lead to increased clinical disease activity in multiple sclerosis. (Buljevac et al., *supra*, at Ex. G, Tab 3, p. 7.) Importantly, however, the Buljevac paper preceded the Langer-Gould study by over a decade. Accordingly, this observation by Buljevac does not undermine the testimony comparing the two papers. And, in any event, for the reasons discussed below, the lack of epidemiologic support for petitioner's theory is not dispositive.

[17] That is, while the Langer-Gould study found that all CNS acute demyelinating syndromes combined, including multiple sclerosis, had an increased risk of symptom onset within 30 days of vaccination, the results did not reach statistical significance for multiple sclerosis standing alone. (Langer-Gould et al., *supra*, at Ex. A, Tab 15, pp. 3-4.)

Nonetheless, Dr. Holmes and Dr. Whitton both filed several epidemiologic studies to support the proposition that vaccinations, including the Menactra vaccine, do not cause the development or relapse of multiple sclerosis. (Ex. A, p. 10; Ex. C, pp. 4-5.) They focus on two studies, in particular.[18] First, Confavreux et al. is a case-crossover study that examined whether vaccinations increase the risk of relapse in multiple sclerosis. (Confavreux et al., *supra*, at Ex. C, Tab 1.) The study concluded that there was no increase in the specific risk of relapse associated with the hepatitis B, tetanus, or influenza vaccinations. (*Id.* at 1, 4-6.) Second, they emphasize a retrospective study by Hansen et al. that assessed the safety of the Menactra vaccination in a population of Kaiser Permanente patients aged 11 to 55 years old who received the Menactra vaccine between April of 2005 and April of 2006. (Hansen et al., *supra*, at Ex. C, Tab 3.) The study participants were monitored for non-elective hospitalizations, emergency department visits, and selected outcomes captured in a clinic setting, including multiple sclerosis, through a six-month period after vaccination. (*Id.* at 1-2.) The investigators did not detect any safety concerns following Menactra vaccination. (*Id.* at 5.)

Neither of these studies specifically focused on whether Menactra vaccine can cause a relapse of multiple sclerosis, a point acknowledged by Dr. Whitton. (Tr. 326.) Moreover, when viewing the findings of the studies submitted by respondent, it is important to also consider the undisputed rarity of pediatric relapsing-remitting multiple sclerosis. (*E.g.*, Ex. A, p. 9; Tr. 75-76, 180.) Given that, it is harder to conclude that the absence of an association between vaccinations and either the development or relapse of multiple sclerosis necessarily supports drawing a definitive conclusion that vaccinations cannot cause a relapse of pediatric multiple sclerosis. Dr. Steinman and Dr. Holmes agree that epidemiological studies can certainly miss rare events. (Tr. 134-35, 228.) Dr. Holmes specifically testified that if you are looking at something that is very rare, an epidemiological study finding no association between a vaccine and autoimmune condition is not the final answer because it does not rule out the possibility that a reaction could occur. (*Id.* at 228.) And Dr. Holmes did otherwise agree as a general matter that it is possible for vaccines to aggravate neurologic disorders via autoimmune mechanisms. (*Id.* at 244.) Accordingly, while I afford the studies cited by respondent some evidentiary weight, I note that these studies have limitations and do not defeat petitioner's showing under *Loving* prong four.

Moreover, the idea that peripheral inflammatory events would cause multiple sclerosis relapses, as suggested by both Buljevac et al. and Langer-Gould et al., is also consistent with what the record evidence otherwise suggests is the pathophysiology of multiple sclerosis. While the evidence supports the conclusion that EBV infection is likely to be initially important to the development of multiple sclerosis, Dr. Steinman explained that multiple sclerosis is multifactorial and that EBV infection alone is not sufficient to result in disease. (Ex. 19, pp. 10-11; Ex. 50, p. 2; Tr. 46, 53-54, 74-75, 79-82, 129.) Specifically, Lanz et al., for which Dr. Steinman was a listed author,

[18] I stress, however, that I have considered all of the epidemiologic studies cited by respondent.

demonstrated "high affinity molecular mimicry between the EBV transcription factor EBV nuclear antigen 1 (EBNA1) and the central nervous system protein glial cell adhesion molecule (GlialCAM)" and further showed experimentally that EBNA1 immunization exacerbated disease in a mouse model of multiple sclerosis. (Lanz et al., *supra*, at Ex. 48, p. 1.) However, Dr. Steinman explained that, given how prevalent EBV infection is, EBV alone cannot explain the development of multiple sclerosis. (Tr. 82.) Instead, he opines that multiple sclerosis develops following a "second hit," which can be in the form of a second infection or, he asserts, a vaccination. (*Id.* at 82-83; 382-83.) Moreover, while Dr. Steinman submitted that the molecular mimics he proposed enhance the likelihood that the immune response to the Menactra vaccine would be significant to this process, he explained that the "second hit" does not depend on the same homology identified relative to the initial EBV infection. (*Id.* at 128-29.)

Thus, for example, in initially explaining the relevance of molecular mimicry to the development of multiple sclerosis, Dr. Steinman cited a paper by Fujinami et al., which explained that the autoimmune pathogenesis of multiple sclerosis may involve multiple mechanisms, including molecular mimicry, bystander activation, and viral persistence. (Ex. 19, pp. 13-14; Fujinami et al., *supra*, at Ex. 31, pp. 4-5.) Fujinami et al. conducted a mouse model experiment wherein they simulated an early-in-life infection in young mice with a virus that had molecular mimicry with central nervous system self-protein, but which did not result in clinical signs of disease. They then administered a "nonspecific immunologic stimulus" at a later time, which produced clinical signs of disease within 10-14 days. (Fujinami et al., *supra*, at Ex. 31, p. 5.) Follow up investigation confirmed T-cell infiltration and lesions in 20% of the mice. (*Id.*) The authors dubbed this process the "fertile field" and advanced several hypotheses, including bystander activation, stimulation of memory T cells, or unrecognized cross-reactive potential between different viruses, to explain how two seemingly unrelated immune responses could combine to generate disease. (*Id.* at 6.) And, importantly, while some of these hypotheses include molecular mimicry with the second antigen as Dr. Steinman has proposed, the proposed hypotheses also encompass the idea that the second hit simply further stimulates the already established molecular mimicry relative to the preceding infection, which Lanz et al. would in turn suggest was an EBV infection.

Consistent with this, Dr. Steinman explained, even as he additionally discussed antibodies, that "the T cell response is very important in multiple sclerosis," with T cells being detected in both the spinal fluid and periphery. (Tr. 383; *see also* Lanz et al., *supra*, at Ex. 48.) "Antibodies to proteins are not made without what we call T cell help." (Tr. 383.) He explained that "[t]he accepted theory of [multiple sclerosis] is the formation of a group of autoreactive T cells that become activated outside of the central nervous system and travel into the central nervous system. If they encounter a myelin antigen and there is an aberrant response, [multiple sclerosis] will develop." (Ex. 19, p. 12.) And, indeed, the above-discussed Fujinami paper likewise noted that CD4+ T cells are found around the periphery of multiple sclerosis plaques. (Fujinami et al., *supra*, at Ex. 31, p. 5.) Moreover, this understanding of multiple sclerosis pathogenesis appears entirely consistent with the understanding that multiple sclerosis relapses are mediated by subsequent inflammatory insults. (*E.g.*, Buljevac et al., *supra*, at Ex. G, Tab 3, p. 1

(explaining that "fluctuations in disease activity are related to alterations in (auto-)immune activity").)

Finally, Dr. Steinman further cited a paper by Raju et al. for the proposition that multiple peptide sequences within diphtheria toxin, which he explained is an integral part of the Menactra vaccine in a toxoided form and is the only protein contained in the vaccine (Ex. 19, p. 11; Tr. 101, 104-05 (citing Menactra Package Insert, *supra*, at Ex. 28)), were shown in healthy human subjects to propagate a CD4+ T cell response, suggesting these specific peptides are immunodominant. (Raju et al., *supra*, at Ex. 43, p. 1.) Dr. Whitton agreed that this paper shows that "a lot of diphtheria toxoid can trigger human CD4 T cell response. It doesn't tell us anything about antibodies, but it does show us the CD4+ T cells." (Tr. 320.) And while Dr. Whitton contends this paper falls well short of demonstrating molecular mimicry, he accepts that it assists petitioner in fulfilling the prerequisite that "the vaccine component must induce an immune response." (*Id.* at 320-21.)

In light of all of the above, and considering the record as a whole, petitioner has met his preponderant burden of proof under *Loving* prong four.

### c. *Loving* prong six

The sixth *Loving* prong requires establishing a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1278; *Loving*, 86 Fed. Cl. at 144. To make this showing, a petitioner must present "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must also coincide with the theory of how the relevant vaccine can cause an injury. *Id.*; *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 542 (2011), *mot. for recons. denied after remand*, 105 Fed. Cl. 353 (2012), *aff'd per curiam*, 503 F. App'x 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.*, No. 11-355V, 2013 WL 3214877, at *26 (Fed. Cl. Spec. Mstr. May 30, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

While the medical records are inconsistent as to the exact onset of petitioner's neurologic symptoms, notably his right-sided numbness, tingling, and weakness, all of the records indicate that these symptoms first presented sometime between January 25, 2018, and January 30, 2018, approximately 14 to 19 days post-vaccination. However, the records consistently identify January 25, 2018, as the onset of vomiting. As explained below under *Loving* prong five, Dr. Steinman is persuasive in attributing petitioner's vomiting to his multiple sclerosis relapse. Therefore, I find that the record preponderates in favor of finding that the onset of petitioner's relapse occurred approximately 14 days post-vaccination.[19]

---

[19] While Dr. Holmes initially indicated in his first report that petitioner's neurologic symptoms, specifically his right-sided numbness and tingling, began on January 25, 2018, he amended his timeline in his final report to reflect an onset of January 30, 2018. (*Compare* Ex. A, p. 9, *with* Ex. G, p. 3.) In his final report,

Apart from his disagreement regarding the proposed causal theory, Dr. Whitton testified that he does not have any issues with the timing in this case. (Tr. 363.) Specifically, he stated that assuming the Menactra vaccine did cause petitioner's relapse via molecular mimicry, he would anticipate an onset between six and 30 days. (*Id.*) Moreover, the Fujinami experiment demonstrated that a "second hit" as theorized by Dr. Steinman produced disease within ten to 14 days regardless of whether the second hit itself involved molecular mimicry. (Fujinami et al., *supra*, at Ex. 31, p. 5.) Additionally, the findings of the Langer-Gould et al. and Buljevac et al. studies both support the timing observed in this case. As discussed above, in Langer-Gould et al., the authors identified a statistically significant increased risk of symptom onset for any CNS acute demyelinating syndrome within 30 days following any vaccination in individuals under the age of 50 years old. (Langer Gould et al., *supra*, at Ex. A, Tab 15, pp. 4-7; *see also* Tr. 136.) In Buljevac et al., the authors noted that for exacerbations starting during the identified at-risk period, the average onset was 9.5 days after the clinical onset of the infection. (Buljevac et al., *supra*, at Ex. G, Tab 3, p. 4.)

Onset in this case is also consistent with prior cases that have identified the relevant temporal period for vaccine-related CNS demyelination, including multiple sclerosis, as being up to about 42 days post-vaccination, comparing that period to the timing of the adaptive immune response otherwise commonly accepted for peripheral demyelinating conditions, such as Guillain-Barré Syndrome ("GBS"). *See, e.g.*, *Robinson v. Sec'y of Health & Human Servs.*, No. 14-952V, 2021 WL 2371721, at *22-23 (Fed. Cl. Spec. Mstr. Apr. 12, 2021) (applying a 42-day onset interval to multiple sclerosis and finding that a 13-day onset following flu vaccination is a medically acceptable timeframe to infer causation via molecular mimicry); *Giannetta v. Sec'y of Health & Human Servs.*, No. 13-215V, 2017 WL 4249946, at *24-25 (Fed. Cl. Spec. Mstr. Sep. 1, 2017) (accepting Dr. Steinman's opinion that 42 days is a medically acceptable timeframe for a person to develop an autoimmune reaction and finding a 42-47 day onset of multiple sclerosis following Menactra vaccination medically reasonable to infer vaccine-causation via molecular mimicry).

Based on all of the above, petitioner has preponderantly shown that the onset of his multiple sclerosis relapse occurred within a timeframe during which it is appropriate to infer a causal relationship to his Menactra vaccination.

### d. *Loving* prong five

The fifth *Loving* prong requires proof of a logical sequence of cause and effect, usually, supported by facts derived from petitioner's medical records. *Althen*, 418 F.3d

---

Dr. Holmes agrees that petitioner's vomiting began on January 25, 2018; however, he attributes petitioner's vomiting to a viral illness, rather than his multiple sclerosis relapse. (Ex. G, pp. 2-3.) It is important to note that the analysis regarding timing in this case is the same regardless of whether onset of petitioner's relapse occurred on January 25, 2018, or January 30, 2018. An onset of 14 days versus 19 days post-vaccination both fall within the relevant temporal timeframe for vaccine-related CNS demyelination.

at 1278; *Loving*, 86 Fed. Cl. at 144; *Andreu*, 569 F.3d at 1375-77; *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1326 (Fed. Cir. 2006); *Grant*, 956 F.2d at 1148. While the opinions of treating physicians are often favored, *Capizzano*, 440 F.3d at 1326, a petitioner may support a causation-in-fact claim through presentation of either medical records or an expert medical opinion. *See* § 300aa-13(a).

Respondent raises three arguments with respect to *Loving* prong five. (ECF No. 71, pp. 21-23.) First, respondent contends that because petitioner failed to preponderantly establish that the Menactra vaccine can significantly aggravate multiple sclerosis, it necessarily follows that petitioner cannot demonstrate that the vaccine actually did cause his relapse. (*Id.* at 21.) However, contrary to what respondent argues, I have concluded that petitioner has presented a sound and reliable theory explaining how the Menactra vaccine can significantly aggravate pre-existing multiple sclerosis by causing a relapse. In *Capizzano*, the Federal Circuit explained that while *Althen* prong two "is not without meaning," the petitioner's satisfaction *Althen* prongs one and three is probative with respect to *Althen* prong two. *Capizzano*, 440 F.3d at 1326. Thus, it is significant to petitioner's *Althen* prong two/*Loving* prong five showing that he demonstrated that the Menactra vaccine can cause a relapse in an individual with pre-existing multiple sclerosis and that the onset of symptoms in this case occurred within a medically reasonable timeframe from which causation can be inferred.

Next, respondent stresses that none of petitioner's treating providers made a clear statement implicating the Menactra vaccine as the cause of his relapse. (ECF No. 71, pp. 21-22.) While petitioner's treating neurologists who diagnosed and managed his multiple sclerosis observed a temporal relationship between petitioner's relapse and his Menactra vaccination (*e.g.*, Ex. 7, pp. 244-45; Ex. 16, pp. 29-30), none of the providers drew any conclusions from that temporal relationship with respect to causation. Rather, petitioner's treating providers were silent as to the cause.[20] However, a causal opinion from a treating provider is not required for a petitioner to prevail in the Program. Thus, the fact that none of petitioner's treating providers specifically implicated the Menactra vaccination as the cause or potential cause of his relapse is not dispositive.

Lastly, respondent contends that petitioner ignores factors in his medical history, unrelated to his Menactra vaccination, that could have caused his multiple sclerosis relapse in January of 2018. (ECF No. 71, pp. 22-23.) During the hearing, when asked what evidence apart from epidemiology supports his opinion that the Menactra vaccine

---

[20] In a record for a primary care encounter on February 20, 2018, Dr. Wolfe documented that petitioner's mother reported that petitioner likely had an allergy to the Menactra vaccine, noting that petitioner had been in the ICU for vaccine-related ADEM. (Ex. 7, p. 327.) The undersigned does not afford this documentation any evidentiary weight for several reasons. First, this encounter occurred prior to petitioner's diagnosis of relapsing-remitting multiple sclerosis and relates to the cause of his initially suspected ADEM, which is not the condition at issue in this case. Second, as respondent points out, the documentation suggests that this notation was based on subjective information provided by petitioner or his parents. (ECF No. 71, p. 21.) The undersigned is not aware of any documentation in other medical records that would support a conclusion that petitioner's treating providers attributed his neurologic deterioration to his vaccination. Additionally, petitioner has not provided any testimonial evidence to suggest that his treating providers associated his neurologic event with his Menactra vaccination.

did not cause petitioner's relapse, Dr. Holmes placed significant emphasis on a possible viral illness. (*E.g.*, Tr. 195-96, 213-15, 217-22.) Respondent argues that Dr. Steinman failed to account for petitioner's vomiting and loose stools as evidence of a viral illness just before petitioner's relapse. (ECF No. 71, pp. 22-23; *see also* Ex. A, p. 13.) On behalf of respondent, Dr. Homles stressed that there is evidence demonstrating that viral illnesses can lead to exacerbations of multiple sclerosis, whereas there is no epidemiological evidence implicating vaccinations. (Tr. 196; Ex. G, pp. 1-2.) Therefore, Dr. Holmes maintains that a viral infection was the far more likely cause of petitioner's relapse. (Tr. 213.) However, for the reasons discussed below, I do not find that the possible viral illness is preponderantly established on this record.

First, the evidence does not preponderate in favor of a finding that diarrhea was present. When petitioner first presented for care post-vaccination on January 27, 2018, he denied experiencing diarrhea. (Ex. 7, p. 318.) Additionally, petitioner's mother provided testimony confirming that petitioner did not have diarrhea at that time. (Tr. 19-20.) While Dr. Holmes acknowledges that petitioner's initial treatment record specifically includes a notation denying the presence of diarrhea (*Id.* at 228-29 (discussing Ex. 7, p. 318)), he places greater emphasis on a later record documenting that around January 25, 2018, petitioner "started vomiting and had slight loose stools as well" (Ex. F, pp. 2-3 (quoting Ex. 6, p. 6); *see also* Ex. A, p. 13; Tr. 230-31, 257 (discussing Ex. 6, pp. 6-7)). He contends that the notation of "slight loose stools" could possibly be indicative of diarrhea and is evidence of petitioner's possible viral illness. (Tr. 213-14; Ex. A, p. 13; Ex. F, pp. 2-3.) However, I am not persuaded that one notation indicating petitioner reported "slight loose stools" warrants a conclusion that petitioner was experiencing diarrhea, especially given the existence of other notations explicitly denying the presence of diarrhea. Moreover, that medical record includes no information on the frequency of petitioner's stools, rendering it impossible to determine whether this subjective report of slightly loose stools is compatible with the definition of diarrhea, a point conceded by Dr. Holmes. (Tr. 214 (discussing Ex. 6, p. 6).)

Although Dr. Holmes maintains that petitioner's treating providers attributed his subjective report of slight loose stools to a viral illness (Ex. A, p. 13; Ex. F, p. 2; Tr. 230-31), that conclusion also is not preponderantly supported by the medical records. Petitioner's pediatrician, the provider who diagnosed petitioner with noninfective gastroenteritis and colitis, made no reference to any loose stools in the January 27, 2018 record, and, in fact specifically noted the absence of diarrhea during this encounter. (Ex. 7, pp. 318-19.) And, while the term "colitis" could in itself be suggestive of diarrhea, it is important to note that the term arises only in the context of using the broader ICD code associated with "noninfective gastroenteritis and colitis USP." (*Id.* at 319.) Therefore, especially when considering that the lack of diarrhea was specifically documented at this encounter, it is not strong evidence favoring an assessment of colitis specifically. (Tr. 58 (Dr. Steinman). *See also* Tr. 255-56 (Dr. Holmes).) Additionally, the medical records specifically confirm the absence of fever and abdominal pain. (Ex. 7, p. 318; Ex. 6, p. 6; Ex. 1, p. 5.) Accordingly, petitioner's only symptom possibly indicative of a viral illness was vomiting. While petitioner was diagnosed with noninfective gastroenteritis and colitis at his initial encounter, Dr. Steinman opined that

the diagnosis was likely inaccurate and clinically unsupported given the lack of diarrhea and abdominal pain. (Tr. 58.) Moreover, subsequent PCR testing failed to detect a specific pathogen. (Ex. 6, p. 83.)

Furthermore, review of the medical records suggests that some of the concern for a possible viral illness may have stemmed from the treating providers' initial suspicion for ADEM. Pediatric cases of ADEM are commonly observed post-infection, with a clinically evident antecedent infection being observed in approximately two-thirds of children with ADEM. (Bennetto & Scolding, *supra*, at Ex. 44, p. 3.) When petitioner presented to the emergency room and was subsequently hospitalized on January 30, 2018, his treating providers arrived at a working diagnosis of ADEM. (Ex. 1, pp. 5-6; Ex. 6, pp. 6, 12.) Documentation in the medical records indicates that petitioner's treating providers strongly favored a diagnosis of ADEM based on petitioner's clinical presentation, age, and apparent viral prodrome. (Ex. 6, pp. 6, 11-12.) Even after petitioner's PCR testing results came back negative, his treating providers still concluded that ADEM was the most likely diagnosis given petitioner's clinical presentation. (*Id.* at 4, 12, 14, 16.) This demonstrates that the strong clinical suspicion for ADEM was based on more than just petitioner's possible viral symptoms. When asked whether there was a possibility that the fact that ADEM was strongly favored as the initial diagnosis influenced the treating providers' conclusion that petitioner had a viral prodrome, Dr. Holmes responded that it is impossible to know what the treating providers were thinking. (Tr. 260.) However, he did acknowledge that a viral prodrome is strongly associated with ADEM, stating that eliciting a history of a viral illness makes treating providers more comfortable with a diagnosis of ADEM. (*Id.* at 259-61.) Accordingly, given the strong association between ADEM and an antecedent infection, it would not be unreasonable to conclude that the strong clinical suspicion for ADEM may have influenced petitioner's treating providers to characterize his vomiting as a viral prodrome.

Finally, Dr. Steinman is persuasive in implicating both petitioner's documented double vision and his brainstem lesions observed on MRI as possible causes of petitioner's vomiting. (Tr. 56-57, 60-61, 141, 156-57.) Because petitioner's brainstem lesions were not located in the medulla, Dr. Holmes opined that it was highly unlikely that petitioner's lesion in the pons impacted the vomiting center. (*Id.* at 215-17, 262-63.) However, he conceded that only a matter of millimeters separates the vomiting center and petitioner's lesion in the pons. (*Id.* at 263.) Moreover, both Dr. Steinman and Dr. Holmes agree that the inflammatory effects of a brainstem lesion can extend beyond the edges of lesion and thereby impact other parts of the brain. (*Id.* at 263, 385.) Accordingly, the fact that petitioner did not have a lesion specifically within the bounds of the area postrema or the medulla more generally does not rule out the possibility that his brainstem lesions impacted the vomiting center and thus caused his vomiting. Additionally, while Dr. Holmes disputes the idea that double vision can cause vomiting (*Id.* at 215-17),[21] Dr. Steinman provided testimony that he has observed patients with

---

[21] Dr. Holmes also questioned whether petitioner's reported double vision was related to his multiple sclerosis. (Tr. 216.) Specifically, he testified that he would not expect a brainstem lesion in the pons to cause diplopia. (*Id.* at 215-16.) However, Dr. Holmes offered little explanation for why a lesion in the

multiple sclerosis who present with both vomiting and double vision (*Id.* at 56-57, 156-57, 369-70). Again, given Dr. Steinman's clinical practice and expertise in multiple sclerosis, I find his opinion on this point persuasive.

Therefore, considering the record as a whole, I find that the evidence does not preponderate in favor of a finding that a that a viral illness was either present or caused petitioner's relapse. Notably, none of petitioner's providers opined that petitioner's relapse was caused by a viral illness. In particular, Dr. Waubant and Dr. Van Haren, the neurologists who diagnosed and managed petitioner's relapsing-remitting multiple sclerosis, do not reference any viral illness in their documentation of petitioner's relevant history apart from noting that his pediatrician initially suspected he had a viral illness when he first presented for care. (Ex. 7, pp. 244-45; Ex. 16, pp. 29-30.) Therefore, this casts doubt on respondent's contention that a viral illness was the more likely cause of petitioner's relapse.

Apart from the possible viral infection, respondent has not offered any other alternative explanation or trigger for petitioner's relapse.[22] Accordingly, for all the reasons stated above, I find that petitioner has preponderantly demonstrated a logical sequence of cause and effect showing that his Menactra vaccination led to the significant aggravation of his pre-existing relapsing-remitting multiple sclerosis.

## VI. Conclusion

For all the reasons discussed above and after weighing the record evidence within the context of this program, I find by preponderant evidence that petitioner experienced a significant aggravation of his relapsing-remitting multiple sclerosis as a result of his receipt of the Menactra vaccination administered on January 11, 2018. A separate damages order will be issued.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master

---

pons would be inconsistent with double vision. In contrast, Dr. Steinman indicated that a lesion in the pons could impair the nuclei for cranial nerves that control the eye muscles and thus lead to double vision. (*Id.* at 369.) Accordingly, I credit Dr. Steinman's opinion on this point.

[22] For this reason respondent has also not met his own shifted burden of proof with respect to demonstrating, once petitioner has met his *prima facie* case, that the alleged injury is nonetheless due to a factor unrelated to the vaccination. § 300aa-13(a)(1)(B).